# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

| | | |
|---|---|---|
| **AMBER D. HALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:  2:20-cv-00146** |
| | ) | |
| **GESTAMP  WEST  VIRGINIA, LLC,** | ) | |
| **BARRY    HOLSTEIN,    KENNETH** | ) | |
| **SUPRENANT & SCOTT HUGHES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANTS' BRIEF SUPPORTING SUMMARY JUDGMENT

Defendants Gestamp West Virginia, LLC ("Gestamp"), Kenneth Suprenant ("Suprenant"), and Scott Hughes ("Hughes") (collectively "Defendants") submit this Brief in support of their Motion for Summary Judgment filed contemporaneously herewith:

## I.      INTRODUCTION

Plaintiff Amber Hall's ("Hall" or "Plaintiff") claims against Defendants for gender and disability discrimination under the West Virginia Human Rights Act ("WVHRA"), and retaliation and interference under the Family and Medical Leave Act ("FMLA") fail because the evidence is undisputed that she was terminated after an investigation concluded that she had violated Gestamp's Zero Tolerance Sexual Harassment policy.  It is undisputed that all Gestamp employees HR Manager Scott Hughes has concluded violated the Zero Tolerance Sexual Harassment policy have been terminated.  Hall's FMLA interference claim fails because she received twelve weeks of leave and returned to work in her position after being released by her health care provider. Summary judgment is due to be granted on all claims.

## II.      STATEMENT OF UNDISPUTED FACTS

### A.      **Gestamp West Virginia**

1.      Gestamp West Virginia, LLC operates a just-in-time auto parts manufacturing facility in South Charleston, WV.  (Hughes Dec. ¶ 2).

2.      Gestamp maintains a fast-paced work environment in its efforts to provide quality automotive components on a timely basis to several well-known automobile manufacturing facilities including Honda, Ford and GM. (Hall Depo. I at 51:10-52:11; Hughes Dec. ¶ 2).

3.      Gestamp has implemented and distributed its Equal Employment Opportunity Policy, which prohibits discrimination or retaliation on the basis of gender and disability, among other reasons, in all terms and conditions of employment.  (Hughes Dec. ¶ 5 & Ex. A).

4.      Under the Company's Zero Tolerance No Harassment/Discrimination policy, employees must bring concerns about harassment, discrimination or retaliation to Gestamp's HR Department at the plant, the corporate HR office or via the anonymous corporate hotline. (Hall Depo. I at 53:23-54:8, DX 4, 5; Hughes Dec., ¶¶ 5.a – c. & Ex. A).

5.      Gestamp maintained Standards of Conduct in its handbook which sets forth types of conduct which are grounds for disciplinary action; included in these Standards are infractions which fall within Gestamp's "Zero Tolerance" policy for which violations "generally will result in immediate termination," including: "Violating Gestamp West Virginia No Harassment/Discrimination Policy."  (Hall Depo. I at 55:8-22, DX 4; Hughes Dec., ¶¶ 6.a.- b.).

6.      Throughout Hughes's employment as HR Manager, Gestamp has applied a rolling 12-month period for determining FMLA eligibility.  (Hughes Dec., ¶¶ 7.e. – f.).  The policy has not changed, and Gestamp has not applied a calendar 12-month period to any employees for determining eligibility for FMLA leave.  (Hughes Dec., ¶¶ 7.e.-f.; Hughes Depo., 20:13-17).

**B.      Plaintiff's Employment**

7.      Hall was hired to work at Gestamp through a staffing company, Adecco, and began

2

work in February 2014. (Hall Depo. I at 26:1-5).

8.      Hall was hired as a Gestamp employee in August 2014, at which time she received a copy of Gestamp's Employee Handbook, including the No Discrimination/Harassment policy, which she understood applied to her.  (Hall Depo. I at 47:15-17, 52:12-23, 53:13-54:8, DX 4, 5).

9.      Hall also understood that Gestamp's no harassment policy was a zero tolerance policy, violations of which would result in immediate termination. (Hall Depo. I at 55:8-22, DX 4; Hughes Dec., ¶ 5 & Ex. A).

10.      After only six months of employment as a Gestamp team member, Hall was promoted to Team Leader by Manager Ken Huebner. (Hall Depo. I at 59:17-22, 63:19-22).

11.      While Hall was a Team Leader, her Supervisor, Keith Lemmon, was out from work on leave, and she "stepped up" into his role for two to three months. (Hall Depo. I at 65:6-23).

12.      After only 7-8 months as a Team Leader, Ms. Hall did not apply for his position, yet, although she was not awarded his position, she was awarded a first shift Supervisor position in Lasers.  (Hall Depo. I at 65:4-66:4; 63:19-22, 68:17-19).

a.      Other Team Leaders were angry because, since Ms. Hall had less tenure, they thought she was receiving special treatment from Manager Ken Huebner, whom Hall was frequently with at work and with whom Hall had been to dinner. (Hall Depo. I at 68:20-70:22).

b.      As Supervisor, Hall was responsible for directing the work of the entire Lasers team on first shift, about 30 employees, ensuring that Company policy was followed and that the correct parts were ready to be delivered on time. (Hall Depo. I at 78:9-79:7).

14.      Hall had a sexual relationship while employed at Gestamp with at least five other employees (Hall Depo. II, 129:7-131:19), plus one customer representative (Hall Depo. I, 20:20-21:20), and sent naked photos to a subordinate employee. (Hall Depo. I, 69:12-16).

3

C.      **Hall's Performance as Group Leader**

13.     Gestamp subsequently phased out the position of Supervisor, and Plaintiff along with other Supervisors became Group Leaders. (Hall Depo. I at 80:15-20).

14.     In January 2016, Operations Manager Barry Holstein took over responsibility for the Laser department.  (Hall Depo. I at 77:21-78:5).

        a.      In February 2016, he met with each Group Leader and went over job duties and expectations for the position and discussed areas in which each Group Leader could improve. (Hall Depo. I at 6-19; Holstein Dec., ¶ 7; Hughes Dec., ¶¶ 9, 9.b.).

        b.      Mr. Holstein discussed with Hall that she needed to improve her attendance, her professional attire, her closeness with her subordinates rather than acting like leader, and her attention to the chain of command.  (Holstein Dec., ¶ 7a.-f. & Ex. A; Hughes Decl., ¶ 9.b.-c.).

15.     Starting in May 2016, Mr. Holstein began conducting performance meetings with Hall to discuss his issues with her attendance and tardiness and her disagreements with following company policy and procedure. (Hall Depo. I at 83:13-21, 87:2-21, 88:14-89:10, DX 10, 11; Holstein Dec., ¶ 8.c.).

16.     In August 2016, Walter Thomas was hired as Gestamp's Plant Director and was tasked with turning around the facility's performance and improving its relationships with customers, who had been in the facility daily.  (Holstein Dec., ¶ 3.g.; Thomas Dec., ¶¶ 1, 2). Thomas's changes placed even greater strain on management as the plant. (Holstein Dec., ¶ 3.g.).

17.     During mid-2016, Hall struggled to keep up with her performance and was repeatedly counseled by Holstein about time management and completing projects on time, attendance, professionalism, consistent policy application, following the schedule and policy instead of her own decisions, and attention to the task at hand rather than spending time in other areas of the plant.  (Holstein Dec., ¶ 8.a.-f.; Thomas Dec. ¶ 3(a), 5a.-e.; Hughes Decl., ¶ 11).

18.     On October 26, 2016, Mr. Holstein met with Ms. Hall and discussed her need for improvement on her attendance and her decision-making and policy application, telling her that failure to improve in these areas would result in disciplinary action. (Hall Depo. I at 110:19-113:6, DX 12; Holstein Dec., ¶ 12 & Ex. C; Hughes Dec., ¶ 12.-12.a. & Ex. C).

19.     After Mr. Holstein's attendance and performance improvement discussion on October 26, Hall called in sick on October 31 and was tardy on November 1; as a result, Holstein issued her a first attendance warning on November 2, 2016. (Hall Depo. I at 117:6-118:8, DX 14; Holstein Dec., ¶ 12.b. & Ex. D; Hughes Dec., ¶ 12.b. & Ex. D).

20.     Hall reported directly to Mr. Holstein until he resigned on January 5, 2017, and was replaced by Rusty Mossberger.  (Hall. Depo., 192:22-193:3; Holstein Dec., ¶ 5).

D.     **Hall's "Hostile Work Environment" Complaints**

21.     In October 2016, Hall complained to Thomas regarding Holstein's workplace behavior. She described his general behavior towards her and other employees on her team and said that Holstein was diminishing morale.  (Hall Depo. I at 120:10-15, 120:23-24, 121:11-13, 122:9-24; Thomas Dec., ¶ 7).  Thomas asked her to document her complaints. (Hall Depo. I at 123:3-6, DX 15; Thomas Dec., ¶ 7(c)).

22.     On October 26, 2016, the same day Holstein had issued Hall met with Hall to discuss her need for improvement and expectations, Hall completed a written complaint, which she later provided to Mr. Hughes.  (Hall Depo. I at 123:12-20, 124:3-8, DX 15; Hughes Dec., ¶ 13.a).  The next day, Hall drafted an additional written complaint, which she later provided to Mr. Hughes. (Hall Depo. I at 124:9-14, 138:1-9, DX 16; Hughes Dec., ¶ 13.a.).

23.     On November 3, 2016, after the day after Holstein had issued Hall a first attendance

warning, Hall sent an email complaint to Mr. Thomas and Mr. Hughes.  (Hall Depo. I at 118:14-119:4, 140:6-17, DX 15, 18; Hughes Dec., ¶ 13.b.; Thomas Dec., ¶ 8).

24.     The three written complaints Hall made contained no allegations of sexual harassment with the possible exception of a fragment on line 22 of a 34-line paragraph on page 4 of a 5.5 page single-space complaint stating Holstein was "looking me up and down like he's hungry."[1] (Hughes Dec., ¶ 13.d.; Hughes Depo. 48:5-8, 62:3-19, 92:13-20, 103:20-21, 105:7-15).

25.     Hall never reported to Hughes that Holstein had asked her out and never made any complaints of sex harassment to Hughes except in hypotheticals, from which he requested that she report any actual conduct of which she knew. (Hall Depo. I at 119:20-120:3, 120:16-19, 158:4-8, 172:3-173:8, 173:23-174:1; Hughes Depo. 48:5-8, 62:3-19, 92:13-20, 103:20-21, 105:7-15).

26.     Thomas summarily reviewed the complaint and told Hughes to conduct a thorough investigation of Hall's complaints. (Thomas Dec., ¶ 8.b.-c.; Hughes Dec., ¶ 13.c.; Hughes Depo. 48:5-8, 62:3-19, 92:13-20, 103:20-21, 105:7-15 & PX 1).

a.      Neither Thomas nor Hughes considered Hall's complaint to be a complaint of sexual harassment.  (Hughes Dec., ¶ 13.d.; Thomas Dec., ¶ 7.b., 8.b.; Hughes Depo. 48:5-8, 62:3-19, 92:13-20, 103:20-21, 105:7-15 & PX 1).

b.      Hughes reviewed the complaint and realized that the complaint contained many allegations of circumstances of which he was already aware, some allegations which did not amount to policy violations, and allegations of general workplace dissatisfaction by Hall regarding the leadership style of Holstein towards her team.  (Hughes Dec., ¶¶ 13.d.-e.; Thomas Dec., 9a.-b.; Hughes Depo. 48:5-8, 62:3-19, 92:13-20, 103:20-21, 105:7-15 & PX 1).

---

[1] Hall testified that another portion of the sentence, "talking about how he always needed me" referred to how he always said he needed her to perform tasks for him at work.  (Hall Depo. I at 145:4-12).

c.      Mr. Hughes interviewed numerous employees in his investigation into Hall's complaint, including, but not limited to, Mr. Holstein, Tom Phipps, Chuck Pennington, Scott Poteat, Matt Tawney, Kelly Carroll, Corey Williams, Milton Myers, Josh Davis, and Caleb Mills.  (Hughes Dec., ¶ 13.f.; Holstein Dec., ¶ 14, 13.e.; Thomas Dec., ¶ 9a.-b.).  None of the individuals he interviewed agreed with any of Hall's allegations.  (Hughes Dec., ¶ 13.f.).

d.      As a result, Hughes concluded that he could not conclude tha Holstein had engaged in any policy violations regarding the allegations in Hall's complaints.  The circumstances she described had either long been resolved previously, failed to amount to policy violations, or were not corroborated by witnesses.  (Hughes Dec., ¶ 13.g.).  Hall did not like Holstein or his leadership and was frustrated by his counseling of her on performance and attendance.  (Hughes Aff., ¶ 13.g.).  While Hall alleged that Holstein screamed at employees on the floor and treated them unprofessionally, the employees Hughes interviewed said Holstein did not scream at them and that, while he was a tough manager, he treated them in a professional manner. (Hughes Dec., ¶ 13.f.; Thomas Dec., ¶ 9; Rogers Dec., ¶ 4.a.-e.)

27.     Hughes informed Hall and Thomas that he could not substantiate the claims in Hall's complaints. (Hall Depo I at 163:8-164:16; Hughes Dec., ¶ 13.h.; Thomas Dec., ¶ 9(b)-(c)). While Hall continued to express dissatisfaction to Mr. Hughes, Mr. Hughes asked her that if Mr. Holstein was violating policies, to give him the facts so that he could investigate them.  (Hughes Dec., ¶ 13.h.).  Hall still made no complaints of sexual harassment to Mr. Hughes.  (Hall Depo. I at 119:20-120:3, 120:16-19, 158:4-8, 172:3-173:8, 173:23-174:1; Hughes Dec., ¶ 13.j.).

**E.      Hall's FMLA Leave and Alleged Disability**

28.     On December 3, 2016, Gestamp safety representative Tony Rinchich called an ambulance to transport Hall to the hospital after her blood pressure and heart rate were uncontrolled and she reported chest pain.  (Hall Depo. I at 181:8-16, 183:11-184:2). Hall was

diagnosed with acute anxiety and released later that day.  (Hall Depo. I at 184:3-9).

29.    Hall applied for and was granted a leave under the FMLA from December 4 - 17, 2016. (Hall Depo. I at 185:19-186:3, DX 20; Hall Depo. II at 19:14-17).  Hall was released to return to work on December 19, 2016 with no restrictions.  (Hall Depo. I at 186:11-16, DX 21).

30.    On January 17, 2017, Hall had an anxiety attack at Gestamp's facility, and she was taken to the hospital where she was released later that evening.  (Hall Depo. I at 195:18-197:4).

31.    Hall applied for and was granted FMLA leave and Short Term Disability benefits from January 17, 2017 until March 20, 2017.  (Hall Depo. I at 198:9-199:6, DX 24; Hall Depo. II at 12:9-14; Hughes Depo., 115:16-19).

32.    On February 15, 2017, Hall brought a letter from her health care provider stating that she was not cleared to work and no date had been set for her return to work.  (Hall Depo. II at 10:15-11:9, DX 26).  Hughes asked how she was doing and told her to keep him updated.  (*Id.*).

33.    Beginning two weeks before Hall's FMLA leave was set to expire, Hughes had tried to call Hall several times but was unable to reach her.  (Hall Depo. II at 15:17-22; Hughes Dec., ¶ 15.f.; Hughes Depo., 117:7-10, 145:8-14).

34.    On March 15, 2017, Hall called Hughes and told him that she was going to be released to be returned to work. (Hall Depo. II at 12:21-13:9, 19:3-5, DX 28, 30, p. 2, ¶ 11).  Hughes asked if she had received the certified letter he had sent her notifying her that her FMLA leave was set to expire, and she responded that she had not.  (Hall Depo. II at 13:10-17).

35.    Hall contacted her physician on March 15 who released her to return to work with no restrictions on March 17.  (Hall Depo. II at 14:4-15:16; Hughes Dec., ¶¶15.g.-h. & Ex. G).

36.    Hall claims that Hughes told her that she had three full months of FMLA when she went out on leave in January, but Gestamp has always utilized a rolling 12-month period for FMLA

leave and did not change its policy or rolling period in January 2017.  (Hughes Dec., ¶¶ 7.e.-f; Hughes Depo., 136:3-12).

37.     Hall received 12 weeks of FMLA leave between December 4, 2016, and March 17, 2017: 2 full weeks and 2 days from December 3 through her return to work on December 19, 2017, 2 days from her return to work before second leave, and nine full weeks after the second time she left the facility.  (Hall Depo. II at 19:14-21; Hughes Dec., ¶ 15.d-e.; Hughes Depo., 131:13-19).

38.     Hall was not denied any FMLA leave she was seeking, instead she was returned to work with no restrictions after she notified Hughes she was going to be returned to work.  (Hall Depo. II at 12:21-13:9, DX 28; Hughes Dec., ¶ 15.g.-i.; Hughes Depo. 115:16-19, 131:13-19).

**F.     Hall's Employment after Second FMLA Leave**

39.     After Holstein resigned on January 5, 2017, Hall began reporting to Rusty Mossberger, whom Thomas had made Manager over the Lasers and Assembly Department. (Hall Depo. I at 193:1-3, 193:22-194:1; Mossberger Dec., ¶¶ 4.b.-c.; Thomas Dec., ¶ 11).

40.     When Hall went out from work on January 17, Group Leader Scott Rogers covered her duties as Group Leader on first shift in addition to his own.  (Rogers Dec., ¶ 6, 6.a.; Mossberger Dec., ¶ 5; Hughes Dec., ¶ 16).

41.     In early 2017, Walter Thomas, in consultation with Mossberger, created the Production Supervisor or Superintendent position on each shift, to which the Group Leaders in Lasers & Assembly reported, and selected Kenneth Suprenant for first shift Supervisor, Antoine Anderson for second shift, and Amanda Koehl for third shift.  (Hall Depo. II at 73:17-74:6, 74:24-75:2; Thomas Dec., ¶ 11(a); Mossberger Dec., ¶ 4.c.; Suprenant Dec., ¶¶ 4.a. and f.).

42.     After Suprenant began as Production Supervisor, Mossberger and he selected Team Leader Aaron Lambert to "step up" into Ms. Hall's position during her absence, to return to his position when she returned, (Suprenant Dec., ¶ 5.b.; Lambert Dec., ¶ 4; Rogers Dec., ¶ 6.b.); and

9

he acted as "step up" for a few weeks during her absence. (Hall Depo. II at 31:19-22, 32:5-22; Lambert Dec., ¶ 4-5; Suprenant Dec., ¶ 6; Suprenant Depo., 25:24-26:4; Hughes Decl., ¶ 17.a.-b.).

43.     Hall was not excluded from any meetings on her return from leave, and Mossberger continued to communicate with Plaintiff in the same manner as he had prior to Plaintiff's leave of absence. (Hall Depo. II at 38:1-11, 38:19-21 (acknowledging Hall went to meetings after she returned from leave and that she does not actually know of any meetings from which she was excluded); Suprenant Dec. ¶ 6.d.; Mossberger Dec.  ¶6.f; Rogers Dec., ¶ 6.e.).[2]

44.     When Hall returned to work on March 20, 2017, she resumed her Group Leader position, responsibilities, pay, and work hours, and Lambert helped her transition for a few days regarding changes that occurred while she was out.   (Hall Depo. II at 34:15-22, 40:21-41:5; Suprenant Dec., ¶¶ 6.a.-b.; Lambert Dec., ¶ 5, 5.a.; Rogers Dec., ¶ 6.d.; Mossberger Dec., ¶¶  6.a.-b.; Hughes Depo., 138:22-139:5, 139:9-14, 139:18-21).

45.     A couple of weeks after Hall came back to work in March, Mr. Lambert was moved to the Assembly Department to help Scott Rogers (Hall Depo. II at 35:16-23, 40:15-18, 41:11-16; Lambert Dec., ¶ 6; Suprenant Dec., ¶ 6.c.; Mossberger Dec., ¶ 6.c.;), and then soon after that, he was transferred to a Team Leader position in the Launch department. (Hall Depo. II at 40:7-14, 41:17-20; Lambert Dec., ¶ 7; Suprenant Dec., ¶ 6.c.; Rogers Dec., ¶ 6.f.; Hughes Dec. ¶ 17.c.). Lambert worked in the area with Hall for less than two weeks upon Hall's return to work. (Hall Depo. II, 31:17-20, 32:5-22; Lambert Dec., ¶¶ 4-5).

46.     Mr. Lambert has never been a Group Leader for Gestamp, has never held a supervisory role, and told Walter Thomas he would rather be a Team Leader than a Group Leader.

---

[2] Suprenant himself took FMLA leave for health issues when he worked at Gestamp, as did other supervisory and non-supervisory employees, including Carolyn Starcher, who remained employed in their positions following their return to work.  (Suprenant Depo. 34:25-35:15; Hughes Dec., ¶ 26).

(Lambert Dec., ¶ 8; Hughes Dec., ¶ 17.d.).

**G.**     **Hall's Sexual Harassment and Termination**

47.     On or about April 21, 2017, Team Member Erica Haynes reported to Mr. Suprenant that Hall had come up to Haynes during a conversation she was having with another employee, stroked Haynes's hair and told Haynes that she had a nice butt, and that Hall wished she had a butt like Ms. Haynes. (Suprenant Dec., ¶¶ 9 & 9.a.; Haynes Aff., ¶ 6).

        a.     As Ms. Haynes appeared very distressed by the incident, and had been for days, and Gestamp's harassment policy obligated Mr. Suprenant to report any allegations of harassment to Human Resources, he asked Ms. Haynes if she wanted to report the incident to HR, and she replied that she did.  (Suprenant Dec., ¶¶ 9.b.– d.; Haynes Aff., ¶ 6; Hughes Dec., ¶ 18).

        b.     Ms. Haynes reported to HR Manager Scott Hughes that Ms. Hall had told her that she had a nice butt and that she wished she had Ms. Haynes's butt while Hall was stroking her hair.  (Haynes Aff., ¶ 9: Hughes Dec., ¶ 18; Hughes Depo., 59:19-20, 64:15-18, 78:7-11, 78:17-20).  Haynes reported that Chris Groom witnessed the conversation, and that Hall had stroked her hair previously and Haynes had asked her to stop.  (Haynes Aff., ¶ 9; Hughes Dec., ¶ 18.b. & Ex. H; Hughes Depo., 78:7-11).  She stated that the incident had continued to bother her since it happened. (Haynes Aff., ¶ 9; Hughes Dec., ¶ 18.b. & Ex. H; Hughes Depo., 78:17-20).

48.     On April 24, 2017, the following Monday, Hall went to Hughes's office to discuss the complaint she had heard Haynes made about her.  Mossberger, Suprenant, and HR Generalist Kristina Dodd were present for the conversation. (Hall Depo. II at 66:13-67:2, 137:19-138:4; Hughes Dec., ¶¶ 19.a.-b.; Hughes Depo., 53:18-22, 58:14-59:5 & PX 1, p. 2).

        a.     During the interview, Hall admitted she told Haynes she had a nice butt but alleged that Haynes had made comments about Hall's breasts. (Hall Depo. II at 60:3-13, DX 33; Hughes Dec., ¶ 19.c.; Suprenant Dec., ¶ 10.a.; Mossberger Dec., ¶ 7.c.; Hughes Depo., 53:18-22,

55:23-56:7, 86:6-10).  Hughes told Hall that as a supervisory employee these types of comments were not appropriate and would not be tolerated. (Hall Depo. II at 67:3-9; Hughes Dec., ¶ 19.d.).

       b.     Hall said that Chris Groom and Rhonda Holbert had witnessed the conversation.  (Hall Depo. II at 62:7-63:17).  After Hall's interview, Hughes, Mossberger, and Suprenant interviewed Chris Groom, Rhonda Holbert, and also interviewed Erica Haynes a second time. (Hall Depo. II at 67:10-14; Hughes Dec., ¶¶ 20.a. - c.; Suprenant Dec., ¶ 10.b.; Mossberger Dec., ¶¶ 7.d. – f.; Hughes Depo. 52:19-52:1, 52:2-7, 52:12-53:1, 84:5-10).

       c.     Groom stated that Hall was stroking Ms. Haynes's hair when she told Ms. Haynes she wished she had a butt like Haynes, and Groom thought the incident was weird, it had taken him aback, and could tell that Ms. Haynes was bothered by it. (Groom Aff., ¶ 4; Hughes Dec., ¶ 20.a.; Suprenant Dec., ¶¶ 8, 10.b. & Ex. B; Mossberger Dec., ¶ 7.d.; Hughes Depo., 84:5-10).  He reported that Haynes did not make any comment about Hall's breasts. (Groom Aff., ¶ 4; Hughes Dec., ¶ 20.a.; Hughes Depo., 51:1-23).

       d.     Holbert did not report hearing the conversation discussed by Haynes or Hall. (Holbert Aff., ¶ 4; Hughes Dec., ¶ 20.b.; Suprenant Dec., ¶ 10.b. & Ex. B; Mossberger Dec., ¶ 7.e; Hughes Depo., 51:1-23, 52:19-52:1).

       e.     Hughes then interviewed Haynes a second time to ask Haynes about the allegations that Hall had made during her interview, Haynes denied making any comments about Hall's breasts, and said that Hall's comments continued to bother her even more. (Haynes Aff., ¶ 10; Hughes Dec., ¶ 20.c.; Suprenant Dec., ¶ 10.b.; Mossberger Dec., ¶7.f.).

       f.     Based on the interviews, Hughes, Mossberger, and Suprenant concluded that Ms. Haynes's complaint was corroborated by the interview of Mr. Groom, but Hall's claim

that Haynes had been joking with her and had made comments about Hall's breasts was not corroborated. (Hughes Dec., ¶ 20.d.; Mossberger Dec., ¶ 7.g.; Suprenant Dec., ¶ 10.c.).

g.      The investigation also revealed that Hall had stroked Haynes's hair on another occasion and Haynes had asked her to stop. (Hughes Dec., ¶ 21.a.; Mossberger Dec., ¶ 8.a.; Hughes Depo., 78:7-11).

49.     Based on the results of the investigation and their conclusion that Hall had violated Gestamp's Zero Tolerance Sex Harassment policy by stroking Haynes's hair, despite being asked not to, while making comments about Haynes's butt, Hughes and Mossberger decided that termination of Hall's employment was appropriate under the policy. (Hughes Dec., ¶ 21; Mossberger Dec., ¶ 8).

a.      As a result, Hughes notified Hall her employment was terminated on April 25, 2017. (Hall Depo. II at 25:10-12, 137:23-138:1, 138:7-16, 139:2-15, 139:22-140:1, DX 43, 44; Hughes Dec., ¶  22 & Ex. M; Hughes Depo., 50:10-24).

b.      Neither Suprenant nor anyone else participated in the decision to terminate Hall.  (Hughes Dec., ¶ 21.d.; Suprenant Dec., ¶ 11; Mossberger Dec., ¶ 8).

**H.    Hall's Gender and Disability Discrimination Claims**

50.     Plaintiff cannot identify any employee who Hughes found to have engaged in sexual harassment and who was not terminated. (Hall Depo. I, 170:4-24).

51.     Under the Zero Tolerance No Discrimination/Harassment policy, every employee who Scott Hughes has been found to have engaged in harassment has been terminated. (Hughes Dec., ¶  21.b.; Mossberger Dec., ¶ 8.b.; Thomas Dec., ¶ 13.b.); Suprenant Dec., ¶ 11.a.).

52.     Hall alleges she suffers from anxiety and PTSD, but she never asked for any changes to her job because of her medical condition, and does not identify any individual who was

13

not disabled who was not terminated after being found to have engaged in sexual harassment. (Hughes Dec., ¶¶ 15.i., 23.a.).  She never asked for additional leave other than what she was provided.  (Hughes Dec., ¶ 15.h.-i.).

**I.     Hall's FMLA Claims**

53.     Hall claims that between her first leave of absence in December 2016 and her second leave of absence in January 2017, she missed three to four days of work and that those days should have been designated as FMLA leave. (Hall Depo. II at 19:16-23:22).

a.     Hall cannot identify what days she believes should have been designated as FMLA leave but were not. (Hall Depo. II at 19:24-20:3; 21:4-11).

b.     Hall cannot show that she requested that these days be designated as FMLA leave, nor can she show that did, in fact, miss work on these unknown days for an FMLA qualifying reason, and there were a few days which were designated as FMLA leave between her two leaves on the FMLA tracker. (Hughes Dec., ¶ 15.d.).  Hall was not penalized in any way for days she missed between her two leaves.  (Hughes Dec., ¶ 15.d.).

54.     Hall also claims she was "put under scrutiny" when she returned from her FMLA leave,[3] but she acknowledges that her job duties did not change and that she was provided assistance with transitioning back into her role as Group Leader. (Hall Depo II at 33:22-34:7; 34:13-20; 42:21-43:5).

55.     Hall claims she was excluded from meetings after she returned from leave, but she acknowledges that she went to meetings after she returned from leave and that she does not actually

---

[3] Specifically, she claims that Mr. Lambert would "check up on everything that [Plaintiff] was doing," but Plaintiff herself testified that she asked Mr. Lambert to assist her with transitioning back into her Group Leader role when she returned to work. (Hall Depo II at 34:13-20; 43:8-9) Plaintiff also complains that Mr. Suprenant and Mr. Mossberger were talking to her about not doing things the way they wanted, but that at the same time, they also were not communicating enough with her about their expectations. (Hall Depo II at. 43:10-16)

know of any meetings from which she was excluded. (Hall Depo II at 35:22-36; 36:21-38:10; 39:4-6;).

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Rhoads v. FDIC*, 257 F.3d 373, 386-87 (4th Cir. 2001). A "material fact" is a fact that might affect the outcome of a party's case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *see Hooven–Lewis v. Caldera,* 249 F.3d 259, 265 (4th Cir. 2001).

### IV.   ARGUMENT

**A.   There is No Genuine Issue of Material Fact Regarding Plaintiff's Disability Discrimination Claims under the WVHRA.**

Plaintiff cannot establish she is a qualified individual with a disability terminated because of that disability as required by W. Va. Code § 5-11-9. Specifically, Plaintiff cannot show a causal link between her alleged disability and her termination or that Gestamp's legitimate reason for Plaintiff's termination was pretextual, and that a disability was the true reason for her termination.[4]

**1.   Plaintiff Was Not Subjected to Disparate Treatment.**

Plaintiff's *prima facie* disability claim fails because Plaintiff cannot establish any causal link between her termination and alleged disability that could raise an inference of unlawful

---

[4] Although Plaintiff purports to bring a failure to accommodate claim (Doc. 44, p. 11), Plaintiff's Complaint states no facts upon which a failure to accommodate claim could be based, and therefore, this claim is due to be dismissed. Plaintiff requested no accommodation due to her disability and was provided all leave she requested.

discrimination. To establish a *prima facie* disability discrimination claim, Plaintiff bears the burden of showing (1) she meets the definition of disabled;[5] (2) she is a qualified individual; and (3) a causal link between her alleged disability and her termination that raises an inference of discrimination. *Powers v. Covestro LLC*, 2017 WL 1952230, at *4 (S.D.W. Va. May 10, 2017); *Daniel v. Raleigh General Hospital, LLC*, 2018 WL 3650248, at *7 (S.D.W. Va. Aug. 1, 2018)(holding plaintiff failed to establish *prima facie* disability discrimination claim under WVHRA where she "failed to establish a causal connection between her stated disability and the adverse employment action taken against her.").

Plaintiff has offered absolutely no evidence establishing a causal link between her medical condition and her termination. There is no temporal proximity between Gestamp's alleged knowledge of Plaintiff's anxiety and Plaintiff's termination.[6] Further, any causal link is broken by the sexual harassment allegations made directly before her termination on April 25, 2017. Moreover, Plaintiff fails to identify any non-disabled employee who was not terminated after having been found to have violated Gestamp's sexual harassment policy. (Facts, ¶ 50).[7] Indeed,

---

[5] Plaintiff's disability discrimination claim also fails because she cannot show that she was disabled or regarded as disabled within the meaning of the WVHRA. *See Bennett v. Kaiser Permanente*, 931 F.Supp.2d 697, 709 (S.D. Md. Mar. 20, 2013)(holding the plaintiff, who suffered from PTSD, failed to show he was disabled). Additionally, that Gestamp knew Plaintiff took FMLA leave is insufficient to show Gestamp regarded Plaintiff as disabled. *See Powers*, 2017 WL 1952230, at *4 ("'[M]ere knowledge of symptoms alone is not sufficient proof that an employer regarded an employee as disabled.'")(quoting *Alexandru v. Ne. Utils. Serv. Co.*, 1996 WL 684421, at *5 (D. Conn. Oct. 10, 1996)); *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219 (10th Cir. 2007) ("An employer's knowledge of an impairment alone is insufficient to establish the employer regarded the employee as disabled."); *Lindenmuth v. Laboratory Corporation of America*, 2016 WL 5109159, at *3 (S.D.W. Va. Sep. 19, 2016)(holding that employee taking leave and returning to work light duty was insufficient to show the employee was disabled or regarded as disabled).

[6] According to Plaintiff, she suffered an anxiety attack at work on December 3, 2016 and first took FMLA leave from December 4-19, 2016. Plaintiff's employment was not terminated until more than four months later on April 25, 2017 (Facts, ¶ 49.a.). *See Daniel*, 2018 WL 3650248, at *7 (noting the Fourth Circuit has held a lapse of three to four months "is too long to establish a causal connection by temporal proximity alone."); *Lindenmuth*, 2016 WL 5109159, at *4-5 ("Simply claiming that termination followed a period of disability is not sufficient to establish [causation].").

[7] *See Lindenmuth*, 2016 WL 5109159, at *3 (noting that to establish a *prima facie* disability discrimination claim under the WVHRA, "the plaintiff should show that the circumstances of the discharge involve at least an inference of discrimination where 'that employee was treated less favorably than similarly situated workers who were not in the

the evidence shows all employees who were found to have violated Gestamp's sexual harassment policy were terminated. (Facts, ¶ 51).

The only purported comparator Plaintiff identifies is Mr. Holstein.  However, it is undisputed that the decisionmakers for Plaintiff's termination, Hughes and Mossberger, had no knowledge of any sexual harassment allegations concerning Mr. Holstein.[8]  (Facts, ¶¶ 24-25). The undisputed evidence shows that Mr. Mossberger and Mr. Hughes made the decision to terminate Plaintiff's employment, after concluding that Plaintiff had violated Gestamp's sexual harassment policy.  (Facts, ¶ 49). The undisputed evidence shows that Hughes investigated the written complaints Plaintiff made against Mr. Holstein but that the complaint did not contain sex harassment allegations and could not be corroborated.  (Facts, ¶ 26.d). Unlike Mr. Holstein, the allegations against Plaintiff were corroborated, and Mr. Mossberger and Mr. Hughes had a good faith belief that Plaintiff violated Gestamp's sexual harassment policy. (Facts, ¶ 49).  Plaintiff's failure to identify any comparators or any other evidence of a causal connection between her alleged disability and her termination is fatal to her attempt to prove disparate treatment. Because Plaintiff cannot succeed in establishing a *prima facie* case, her disability discrimination claim fails.

### 2.        Plaintiff Cannot Establish that Gestamp's Legitimate, Non-

---

employee's protected class.'"); *Lightner v. City of Wilmington,* 545 F.3d 260, 265 (4th Cir. 2008) (holding "the similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful"); *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 715 (D. Md. 2013) (plaintiff failed to identify comparators for disparate treatment when the comparators' conduct was not similar); *see also Adams v. Greenbrier Minerals, LLC*, 2018 WL 5928057, at *3 (S.D.W. Va. Nov. 13, 2018)(noting disability discrimination cases under the WVHRA are often analyzed under the same framework as the ADA).

[8] *See Duggan v. Sisters of Charity Providence Hosps.*, 663 F.Supp.2d 456, 463 (D.S.C. 2009)( A plaintiff charging an employer with disparate discipline must show the decisionmaker 'consciously overlooked' misconduct by others outside the protected class 'when he disciplined [plaintiff] more severely.'")(quoting *Moreland v. Miami–Dade County,* 255 F.Supp.2d 1304, 1313 (S.D.Fla.2002)); *Gainey v. Bluecross Blueshield of S.C.*, 2010 WL 3699871, at *7 (D.S.C. Aug. 9, 2010), *report and recommendation adopted*, *Gainey v. BlueCross & BlueShield of S.C.,* 2010 WL 3702587 (D.S.C. Sept. 14, 2010)(alleged comparator could not be considered where there was no evidence of decision maker having knowledge of similar misconduct by comparator); *Jones v. Giant of Maryland, LLC*, 2010 WL 3677017 (D. Md. Sept. 17, 2010)(noting the plaintiff was required to show that the decision maker had knowledge of the comparator's similar misconduct and "consciously overlooked" the misconduct).

### Discriminatory Reasons are Pretextual.

Even if Plaintiff could establish a *prima facie* claim of disability discrimination, which she cannot, her claim would still fail because she cannot show that Gestamp's legitimate, non-discriminatory reason for her termination was pretextual.[9]  Courts have consistently held that an employer has a legitimate, nondiscriminatory reason for terminating an employee when the employer has a good faith belief that the employee violated an applicable workplace conduct policy.[10]  Here, Gestamp's legitimate, non-discriminatory reason for Plaintiff's termination was her violation of Gestamp's sexual harassment policy (Facts, ¶ 49).[11]

Because Gestamp had a legitimate, non-discriminatory reason for Plaintiff's termination, Plaintiff's disability discrimination claim can survive summary judgment only if Plaintiff can establish pretext, which requires that Plaintiff create a genuine issue of material fact as to whether Gestamp's reason for Plaintiff's termination was **false** and that her alleged disability was the **real reason**.[12]  Plaintiff cannot meet this burden.  Further, Plaintiff does not dispute that Mr. Hughes

---

[9] *See Powers*, 2017 WL 1952230, at *6.

[10] *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007)(holding the plaintiff could not establish pretext where employer had honest belief that the plaintiff engaged in misconduct); *Gibson v. Corning Inc.*, 2015 WL 1880188, at *5 (E.D.N.C. Apr. 13, 2015)(noting a good faith belief of misconduct is a legitimate reason for discharge); *Carter v. Nation Ford Chemical Corporation*, 2005 WL 8164994, at *6 (D.S.C. Nov. 10, 2005)(holding plaintiff failed to establish pretext because she did not present any evidence disputing that employer had good faith belief that plaintiff had engaged in misconduct); *Whittington v. Variety Wholesalers, Inc.*; *see also Adams*, 2018 WL 5928057, at *3 (noting a legitimate, non-discriminatory reason, "need not be a particularly good one," provided it is "any other reason except that the plaintiff was a member of a protected class.").

[11] An employer's burden of establishing a legitimate, non-discriminatory reason for its actions is one of production, not persuasion.  *Stewart v. MTR Gaming Group, Inc.*, 581 Fed. Appx. 245, 248 (4th Cir. 2014); *Moore v. Mkasey*, 305 Fed. Appx. 111, 114 (4th Cir. 2008); *Ramos v. Molina Healthcare, Inc.*, 963 F.Supp.2d 511, 524 (E.D. Va. Aug. 8, 2013).  The undisputed facts show that Ms. Haynes complained that Plaintiff had sexually harassed her and that Gestamp conducted an investigation into Ms. Haynes' complaint.  The undisputed evidence also shows that Ms. Haynes' complaint against Plaintiff was corroborated by other witnesses.

[12] *See Adams*, 2018 WL 5928057, at *3-4 (holding the plaintiff failed to establish pretext because he could not show that the reason for the adverse action was false or that the employer acted discriminatorily on the basis of disability); *Drummond v. Stackley*, 687 F. App'x 277, 278 (4th Cir. 2017) ("A plaintiff proves pretext by showing both that the reason was false, and that discrimination was the real reason for the challenged conduct.").

conducted an investigation into Ms. Haynes' complaint, does not dispute she commented Ms. Haynes's butt or that other witnesses corroborated Ms. Haynes' complaint. (Facts, ¶ 26.d). Finally, Plaintiff does not allege, nor can she show, that Mr. Mossberger or Mr. Hughes had any reason to believe that Ms. Haynes' complaint against Plaintiff was false. (Facts, ¶ 49).

Not only can Plaintiff not show that the reason given for her termination was false, which alone is fatal to her disability discrimination claim, she also cannot show that her alleged disability was the true reason for her termination. Plaintiff does not allege, much less point to any evidence that Mr. Mossberger or Mr. Hughes ever considered Plaintiff's alleged anxiety or PTSD in making the decision to terminate her employment. She does not allege, much less point to any evidence, that Mr. Mossberger, Mr. Hughes, or anyone else ever made any negative comments about Plaintiff's anxiety or PTSD. In contrast, she admits Mossberger made sympathetic comments about her anxiety condition. (Hall Depo. I, 194:18-24). Because Plaintiff cannot present evidence showing that Gestamp's legitimate, non-discriminatory reason for her termination was false and that her alleged disability was the true reason for her termination, her disability discrimination claim fails as a matter of law.

**B.     There is No Genuine Argument Regarding Plaintiff's Claim for Gender Discrimination under the WVHRA.**

To demonstrate a *prima facie* case of gender discrimination under the WVHRA, W. Va. Code Sec. 5-11-1, et seq. (1979), Plaintiff must prove: (1) she is a member of a protected class; (2) the employer took an adverse decision concerning the plaintiff; and (3) but for Plaintiff's protected status, the adverse decision would not have occurred. *Conaway v. Eastern Associated Coal Corp.*, 178 W. Va. 164, 358 S. E. 2d 423 (1986).[13] Here, Plaintiff cannot demonstrate a *prima facie* case

---

[13] On the third element, the West Virginia Supreme Court held: "Direct proof, however, is not required. What is required of the plaintiff is to show some evidence, which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was

of gender discrimination because she cannot establish any causal connection between her termination and her gender and she cannot show that her termination for violating the sexual harassment policy was pretextual.

### 1. Plaintiff Cannot Establish Causation

Plaintiff has failed to provide any evidence to create an inference of gender discrimination. To establish causation, Plaintiff must "show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion." *Tom's Convenient Food Mart*, 527 S.E.2d at 158 (quoting *Conaway v. Eastern Associated Coal Corp.*, 358 S.E.2d 423, 4429-430 (W.Va. 1986)). This inference can be raised in the form of an employer admission, unequal treatment, or statistics showing that members of the protected class received substantially worse treatment. *Id.* Plaintiff does not contend that anyone at Gestamp told her that her gender had anything to do with her termination. Additionally, as discussed in Section IV(A)(1), *supra*, she can point to no individual outside her protected class who engaged in misconduct that was similar in all relevant respects to Plaintiff's misconduct but who was not terminated.[14] In contrast, the undisputed evidence reflects that Gestamp has terminated several male employees, including a Group Leader, for violations of the Zero Tolerance Sexual Harassment policy. In short, Plaintiff has "failed to show any sort of nexus between [Gestamp's]

---

based on an illegal discriminatory criterion. This evidence could, for example, come in the form of an admission by the employer, a case of unequal or disparate treatment between members of the protected class and others by the elimination of the apparent legitimate reasons for the decision, or statistics in a large operation which show that members of the protected class received substantially worse treatment than others." *Id.* at 170-1.

[14] *See Syrecea Parker, Plaintiff, v. Premise Health Employer Sols., Inc., Defendant.*, 2020 WL 6218795, at *12 (D.S.C. June 5, 2020), *report and recommendation adopted, Parker v. Premise Health Employer Sols., LLC*, 2020 WL 5810519 (D.S.C. Sept. 30, 2020)(noting comparator must be similarly situated in all relevant respects, including seriousness of misconduct and decision maker); *Simmons-Blount v. Guilford County Bd. of Educ.*, 2010 WL 1418871, at *5 (M.D.N.C. Apr. 7 2020); *Lambert v. Centerra Group, Inc.*, 2019 WL 8164782, at *5 (D.S.C. Aug. 19, 2019).

decision to [terminate her employment] and a discriminatory reason." *Smith v. Sears, Roebuck and Co.*, 516 S. E. 2d 275, 280 (W.Va. 1999). As a result, Plaintiff's gender discrimination claim cannot survive summary judgment.

### 2. Plaintiff Cannot Rebut Gestamp's Legitimate Non-Discriminatory Reason for Plaintiff's Termination.

Even if Plaintiff could establish a *prima facie* claim, which she cannot, Gestamp has presented a legitimate, non-discriminatory reason for Plaintiff's termination, and Plaintiff cannot show Gestamp's stated reason is false and that her gender was the true reason for her termination.[15] As with her disability discrimination claims, to establish pretext, Plaintiff must show that the reason given for her termination was **false** and that her gender was the **true** reason.[16] And, as with Plaintiff's disability discrimination and FMLA retaliation claims, Plaintiff's inability to rebut the reason and demonstrate that the basis for termination is false and that her gender was the true reason for Gestamp's actions requires summary judgment in Gestamp's favor on Plaintiff's gender discrimination claim. *See* Section IV(A)(2), *supra*.

### C. There is No Genuine Issue of Material Fact Regarding Plaintiff's Claim for Interference or Retaliation under the FMLA.

#### 1. Plaintiff Cannot Establish a Genuine Issue of Material Fact as to Her FMLA Interference Claim.

Plaintiff cannot prove FMLA interference, which requires that she "demonstrate that [s]he

---

[15] A plaintiff's *prima facie* case of disparate treatment employment discrimination can be rebutted by the employer's presentation of evidence showing a legitimate and non-discriminatory reason for the employment-related decision in question. *Tom's Convenient Food Mart, Inc. v. West Virginia Human Rights Com'n*, 206 W. Va. 611,527 S.E.2d 155 (W.Va. 1999); "The reason need not be a particularly good one.  It need not be one which the judge or jury would have acted upon. The reason can be any other reason except that the plaintiff was a member of a protected class. If the fact finder believes that the proffered reason was the true reason for the decision, then the employer, while he may be guilty of poor business practices, is not guilty of discrimination. " *Conaway v. E. Associated Coal Corp.*, 178 W.Va. 164, 171, 358 S. E. 2d 423, 430 (W.Va. 1986) (internal citations omitted).

[16] *See Lindenmuth*, 2016 WL 5109159, at *7; *Godbolt v. Trinity Protection Services, Inc.*, 2017 WL 2579020, at *10 (D.Md. 2017); *Maness v. City of High Point, North Carolina*, 2018 WL 6031191, at *8-9 (M.D.N.C. Nov. 16, 2018).

was denied a benefit to which [s]he was entitled under the FMLA," **and** that she "has been prejudiced by the violation in some way."[17] Prejudice requires a showing of some monetary loss or "some loss in employment status remediable through 'appropriate' equitable relief, such as employment, reinstatement, or promotion." *See Ranade v. BT Americas, Inc.*, 581 F. App'x 182, 184 (4th Cir. 2014). Plaintiff's interference claim fails because she cannot show Gestamp denied her any right or benefit she was entitled to under the FMLA or that she suffered any prejudice.

Plaintiff's only allegations in support of her interference claim are that she was purportedly denied three to four days of FMLA leave between December 2016 and January 2017. (Facts, ¶ 53) However, Plaintiff cannot identify any specific day that she believes should have been designated as FMLA leave but was not, much less that she requested that the days be designated as FMLA leave.  (Facts, ¶ 53.a.) Nor can she show that she, in fact, missed work on these unknown days for an FMLA qualifying reason, or that she was penalized for missing the days.  (Facts, ¶ 53.a.)  On the contrary, Plaintiff requested and was approved for leave under the FMLA from December 3 – December 19, 2016 and from January 17 through March 20, 2017.  (Facts, ¶ 37).  Further, Plaintiff admits that after being authorized by her physician to return to work without restriction,[18] she was restored to the same Group Leader position she was in before her leave, with the same job duties and same pay and benefits. (Facts, ¶ 44).  The evidence reflects that she received 12 weeks of

---

[17] Plaintiff must show that (1) she was an eligible employee, (2) Gestamp was an FMLA-defined employer, (3)s he was entitled to leave under the statute, (4) she gave notice to the employer that she would take FMLA leave, and (5) Gestamp denied her FMLA rights. *Trail v. Util. Trailer Mfg. Co.*, 2020 WL 104681, at *5 (W.D. Va. Jan. 8, 2020).

[18] Plaintiff's contention that absences after her physician released her to return to work without restriction should have been designated as FMLA leave fails because she does not show that she requested the absences be designated as FMLA leave or that they were related to a qualifying serious health condition. *See Mayland v. St. Joseph Med. Ctr.*, 2001 WL 708815, at *1 (D. Md. June 11, 2001)(holding the plaintiff's FMLA claim failed "[i]n the absence of any evidence that any doctor thought [the plaintiff] was not fit to return to work."); *Bullock v. Kraft Foods, Inc.*, 2011 WL 5872898, at *5 (E.D. Va. Nov. 22, 2011), *aff'd*, 501 F. App'x 299 (4th Cir. 2012)(holding the plaintiff's claim that employer failed to designate absences as FMLA leave was unsupported where she had been authorized by her physician to return to work).

22

FMLA leave, and, even if she had been a couple of day short of 12 weeks, she had been released to return to work by her doctor without restrictions before she returned to work.[19]   Simply put, Plaintiff cannot meet her burden of showing she was denied any right to which she was entitled under the FMLA, much less that she was suffered some monetary loss or some loss in employment status as a result of the alleged violation. [20]   Plaintiff's FMLA interference claim, therefore, fails as a matter of law.

### 2.   Plaintiff Cannot Establish a Genuine Issue of Material Fact as to Her FMLA Retaliation Claim.

Plaintiff cannot establish a *prima facie* case of FMLA retaliation. Where, as here, there is no direct evidence of retaliatory motive or intent on the employer's behalf, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies, with the ultimate burden of proving intentional retaliation resting at all times with Plaintiff. *See Fry v. Rand Constr. Corp.*, 964 F.3d 239, 245 (4th Cir. 2020); *see also Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 252 (4th Cir. 2015). Under this framework, Plaintiff must prove the following elements

---

[19] Even if Plaintiff could show that Hughes advised her of the incorrect method for calculating leave, which she cannot, there is no prejudice, as required for an FMLA interference claim, because Plaintiff was released to return to work without restriction and she cannot show that Hughes' alleged misrepresentation as to how leave was calculated caused Hall structure her leave differently or to otherwise be denied leave to which she was entitled. *See Lopez v. City of Gaithersburg*, 2016 WL 4124215, at *10 (D.Md. Aug. 3, 2016)(holding plaintiff could not show prejudice, as required for an FMLA interference claim, because she could not show that employer's mistake caused her to structure her leave differently); *Wisz v. Wells Fargo*, 2014 WL 3051320, at *7 (D.Md. Jul. 2, 2014)(holding plaintiff's FMLA interference claim failed because she could not show she was prejudiced by employer's failure to accurately track FMLA leave available); *Davis v. Medical University of South Carolina-Physicians*, 2016 WL 1221909, at *13-14 (D.S.C. Mar. 29, 2016)(holding plaintiff's FMLA interference claim failed even though plaintiff asserted employer told her she had an additional day of leave available, because evidence showed plaintiff was given all leave to which she was entitled)

[20] That plaintiff's position was temporarily filled by another employee while Plaintiff was on leave does not support a claim of interference, nor do Plaintiff's allegations that she did not immediately receive her desk back after returning from leave.  *See Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179 (4th Cir. 2017)(holding allegations of loss of prestige did not support FLMA claim); *Csicsmann v. Sallada*, 211 F. App'x 163 (4th Cir. 2006)(holding the plaintiff's FMLA interference claim failed where the plaintiff claimed loss of prestige, but the plaintiff retained the same salary, title, bonus eligibility, health care, and retirement benefits); *Breeden v. Novartis Pharm. Corp.*, 646 F.3d 43 (D.C. Cir. 2011)(holding the plaintiff's allegations of a reduction in tasks and sharing a work space upon returning from FMLA leave did not support FMLA interference claim).

of her *prima facie* case: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment decision; and (3) there exists causal connection between the protected activity and the adverse employment action. *Id.*

Plaintiff cannot establish a *prima facie* case because she has failed to come forward with any evidence of a causal link between her FMLA leave and her termination.[21]  Plaintiff returned from her FMLA leave on March 19, 2017 to her same Group Leader position, with the same job duties and same pay.  Plaintiff's employment was not terminated until April 24, 2017, more than a month later after she returned to work with her job duties, pay, and benefits fully restored, and only after an intervening complaint of sexual harassment had been made against Plaintiff and corroborated. *See Waag v. Sotera Defense Solutions, Inc.*, 857 F.3d 179, 190 (4th Cir. 2017)(holding a month-long gap between leave and termination was insufficient to permit a jury to conclude that the plaintiff was fired in retaliation for taking protected leave).[22]  Given the undisputed evidence that Plaintiff was restored to her position with full pay and benefits and that an intervening complaint of sexual harassment was made against Plaintiff and corroborated after investigation, Plaintiff cannot meet her burden of establishing a causal connection between her

---

[21] To the extent Plaintiff bases her FMLA retaliation claim on her allegation she was "put under scrutiny" and excluded from meetings when she returned from leave, the claim fails because she cannot show that she suffered an adverse action. *Bradley v. U.S.Foods, Inc.*, 2015 WL 5158731, at *4 (D.S.C. Sep. 2, 2015)(holding increased scrutiny is not an adverse action); *Drake v. Science Applications International Corporation*, 2019 WL 1574264, at *7 (D.S.C. Mar. 4, 2019)(holding increased scrutiny was not adverse action).  Plaintiff herself testified that following her FMLA leave, she was returned to her previous position, with her previous job duties, and the same rate of pay. Plaintiff also testified that, at her request and the suggestion of her supervisors, Mr. Lambert, who had been filling in for Plaintiff, assist Plaintiff with transitioning back into her role as Group Leader. Plaintiff further testified that she attended scheduled meetings for Group Leaders after she returned from leave, and that she does not actually know of any meetings from which she was excluded.

[22] *See also Gomez v. Haystax Tech., Inc.,* 292 F. Supp. 3d 676 (E.D. Va. 2017), *aff'd,* 761 F. App'x 220, 685 (4th Cir. 2019)(noting "the Supreme Court has stated that the 'cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.'")(citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)).

FMLA leave and her termination.

Even assuming Plaintiff could state a *prima facie* claim of retaliation (which she cannot), Gestamp articulated a legitimate, non-retaliatory reason for Plaintiff's termination, which Plaintiff cannot rebut as pretextual.  Notably, the FMLA does not prevent "an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior." *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 249 (4th Cir. 2020) (quoting *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 304–05 (4th Cir. 2016)). As set forth in Section IV(A)(2), *supra*, Gestamp has met its burden of establishing a legitimate, non-retaliatory reason for Plaintiff's termination.  Plaintiff's employment at Gestamp was terminated, as it would have been for any other employee in a similar situation. (Facts, ¶ 51).  Thus, to survive summary judgment, Plaintiff must create a genuine issue of material fact both as to whether Gestamp's reason is **false** and that retaliation was the **real reason**.[23] As with Plaintiff's disability discrimination claim, Plaintiff's inability to rebut the reason and demonstrate that the basis for termination is false and that FMLA usage was the true reason for Gestamp's actions requires summary judgment in Gestamp's favor on Plaintiff's FMLA retaliation claim.  *See* Section IV(A)(2), *supra*.

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, summary judgment is appropriate for all of Plaintiff's claims and Defendants respectfully request that this Court grant this Motion and dismiss Plaintiff's case against all Defendants with prejudice, taxing costs.

---

[23] *See Drummond*, 687 F. App'x 277, 278 (4th Cir. 2017) ("A plaintiff proves pretext by showing both that the reason was false, and that discrimination was the real reason for the challenged conduct."); *Fry v. Rand Constr. Corp.*, 964 F.3d 239 (4th Cir. 2020)(noting that to establish pretext for her FMLA retaliation claim, the plaintiff had to show that the employer's reason for its action was false and that retaliation was the real reason).

Respectfully submitted,

**GESTAMP WEST VIRGINIA, LLC;**
**KENNETH SUPRENANT; and**
**SCOTT HUGHES,**

**By Counsel.**

|  |  |
|---|---|
| | _/s/  Raj A. Shah_     _11/06/2020_ |
| Ronald Flowers, Esquire | Raj A. Shah, Esquire (#11269) |
| (*admitted pro hac vice*) | **HENDRICKSON & LONG, PLLC** |
| **BURR & FORMAN LLP** | 214 Capitol Street (zip 25301) |
| Suite 3400 | P.O. Box 11070 |
| 420 North 20th Street | Charleston, West Virginia   25339 |
| Birmingham, Alabama 35203 | (304) 346-5500 |
| (205) 251-3000; (205) 458-5100 (facsimile) | (304) 346-5515 (facsimile) |
| rflowers@burr.com | rshah@handl.com |

26

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

| | | |
|---|---|---|
| **AMBER D. HALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 2:20-cv-00146** |
| | ) | |
| **GESTAMP WEST VIRGINIA, LLC,** | ) | |
| **BARRY HOLSTEIN, KENNETH** | ) | |
| **SUPRENANT & SCOTT HUGHES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Raj A. Shah, do hereby certify that on the **6th day of November, 2020**, I have served a true and exact copy of the foregoing **"DEFENDANTS' BRIEF SUPPORTING SUMMARY JUDGMENT"** using the Court's CM/ECF system, which will electronically deliver a true copy thereof upon counsel of record listed below:

> D. Adrian Hoosier II, Esquire
> **HOOSIER LAW FIRM PLLC**
> Suite 100
> 213 Hale Street
> Charleston, West Virginia  25301
> *Counsel for Plaintiff*

> <u>/s/  Raj A. Shah              11/06/2020</u>
> Raj A. Shah, Esquire (#11269)
> **HENDRICKSON & LONG, PLLC**
> 214 Capitol Street (zip 25301)
> P.O. Box 11070
> Charleston, West Virginia   25339
> (304) 346-5500
> (304) 346-5515 (facsimile)
> rshah@handl.com