**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

| | |
|---|---|
| **AMBER D. HALL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **GESTAMP WEST VIRGINIA, LLC,** | )   Civil Action No.:  2:20-cv-00146 |
| **BARRY HOLSTEIN, KENNETH** | ) |
| **SUPRENANT & SCOTT HUGHES,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**PLAINTIFF, AMBER HALL'S, RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**COMES NOW, Your Plaintiff, Amber D. Hall, by counsel, D. Adrian Hoosier, II, and
for her Response to Defendants' Motion for Summary Judgment states and avers
as follows'**

**I.      INTRODUCTION/SUMMARY OF CLAIMS**

Plaintiff, Amber Hall ("Hall" hereinafter) brings before this Honorable Court five (5)

claims related to her wrongful termination from Defendant Gestamp of West Virginia, LLC

("Gestamp" hereinafter): 1) violation of the West Virginia Human Rights Act ("WVHRA"

hereinafter) – disability discrimination resulting in retaliatory discharge / wrongful

termination; 2) violation of the WVHRA – failure to accommodate disability resulting in

retaliatory discharge / wrongful termination; 3) violation of the WVHRA – gender/sex

discrimination resulting in discriminatory discharge / wrongful discharge; 4) interference

with Hall's rights pursuant to The Family and Medical Leave Act of 1993, 29 U.S.C.A. §§

2611 through 2617 ("FMLA" hereinafter); and, 5) FMLA retaliation resulting in retaliatory

1

discharge / wrongful discharge.  See, Memorandum and Order, Docket Entry No. 44, Entered August 27, 2020 (herein).

## II.    <u>FACTUAL STATEMENT RELATED TO PLAINTIFF'S CLAIMS</u>

Hall was employed at Gestamp West Virginia, LLC (hereinafter "Gestamp") in South Charleston, West Virginia from February 2014 to April 25, 2017.  *See*, Ex. 30, *Affidavit of Amber Hall*.  Defendants Barry Holstein, Kenneth Suprenant and Scott Hughes were all employees of Gestamp.  Barry Holstein ("Holstein" hereinafter) was for some time Hall's direct supervisor.  *Id*.  Thereafter, Kenneth Suprenant ("Suprenant" hereinafter) was Hall's supervisor.  *Id*.  And, at all times relevant to Hall's complaints, Scott Hughes ("Hughes" hereinafter) was the Human Resources manager at Gestamp.  *See*, Ex. 31, Deposition Transcript of Scott Hughes, pages 5-6.

Hall was an employee on the rise at Gestamp until she experienced medical setbacks resulting in required FMLA leave.  *Supra*.  In fact, she was in the Army National Guard for eight years achieving an E-3 rank before her honorable discharge for medical reasons. Ex. 1*, Hall Depo T.R. Vol. I*, at pages 23-4.  She applied for Gestamp via contract employer Adecco.  Ex. 1*, Hall Depo T.R. Vol. I*, at page 39. Hall interviewed with Gestamp employees Ken Huebner and Valerie Somerville and was hired for the job in the "Lasers" department with Ken Huebner serving as her supervisor.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 40-44. Eight months after working as a temporary employee Amber was promoted to a Gestamp full time employee as a production associate starting in August 2014 at $12/hour.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 46-47.  Hall moved up to a Team Leader Position and her pay increased nearly 25% to $15/hour within six months of employment.

2

Ex. 1*, Hall Depo T.R. Vol. I*, at pages 60-63.  In fact, Hall moved up so fast to the management position other employees were upset. Ex. 1*, Hall Depo T.R. Vol. I*, at pages 68-69.  Particularly, Chris Groom and Rhonda Holbert were upset about Hall's quick climb to a Team Leader Position at Gestamp. Ex. 1*, Hall Depo T.R. Vol. I*, at pages 269-70. Hall was promoted again on October 10, 2015 to a supervisor position earing $62,000.00/year.  Ex. 1*, Hall Depo T.R. Vol. I*, at page 75.  And was receiving great reviews.  See, Ex. 21, generally. In February 2016 Hall received another advancement, this time a merit increase from $62,000/year to $65,000/year. Ex. 1*, Hall Depo T.R. Vol. I*, at page 82.

Hall advanced her path again with Gestamp, this time being promoted from supervisor to group leader.  Ex. 1*, Hall Depo T.R. Vol. I*, at page 81.  This is about the time she was managed by Barry Holstein ("Holstein" sometimes hereinafter).  This is the start of the problems with Hall's Employment.  It was little things at first, like the fact that Hall was supposed to complete leadership training, but she was not permitted to take the course as Holstein put Steven Thomas in the program in place of Hall.  Ex. 1*, Hall Depo T.R. Vol. I*, at page 77. Barry Holstein failed to review Hall's responsibilities has a supervisor with her, causing Scott Hughes to have to review the responsibilities with Hall several months later. Ex. 1*, Hall Depo T.R. Vol. I*, at page 81.

In this new position, Hall's hours did increase.  However, she was assigned more hours than anyone else; she would work from three a.m. until seven p.m., eight p.m., nine p.m., ten p.m., and even up till two a.m. the next day (nearly a 24 hours shift). Ex. 1*, Hall Depo T.R. Vol. I*, at pages 84-85.  While Barry Holstein, her boss, normally only worked six a.m. to five p.m..  Ex. 1*, Hall Depo T.R. Vol. I*, at page 85.

3

Holstein has issues with Hall's relationship with Honda employee, Korey Blimke. Ex. 1, *Hall Depo T.R. Vol. I*, at page 89.  Holstein apparently made up a story that Hall "flipped off" a Honda employee and reported the same to Human Resources.  Ex. 1, *Hall Depo T.R. Vol. I*, at page 89.  Later, the complaint against Hall was changed to a "jack-off" gesture.  Ex. 1, *Hall Depo T.R. Vol. I*, at page 90.  Later it was determined that Holstein complained of the unfounded "flipping off" and "jack-off" gesture alleged to have been made by Hall because Holstein was mad at Hall for Hall rejecting Holsteins attempt to get Hall to go on a date with her. Ex. 1, *Hall Depo T.R. Vol. I*, at page 91. Holstein then became more involved in Hall's relationships, told her that she needed to dress different from men who had the same job, that Hall should do her hair and apply makeup. Ex. 1, *Hall Depo T.R. Vol. I*, at pages 92-95.  Holstein then started unilaterally changing Hall's start time from 6:30 am to as early as 2:30 am, this became a near daily occurrence. Ex. 1, *Hall Depo T.R. Vol. I*, at page 95-96.  The issues with Holstein caused Hall anxiety and exhaustion, it got to the point where Plant Manager Paul Lezanic told Hall he was worried about her mental health.  Ex. 1, *Hall Depo T.R. Vol. I*, at page 103.  Paul Lezanic noted that while Hall is good at her job, maybe it was not for her.  Ex. 1, *Hall Depo T.R. Vol. I*, at page 103.

Holstein then tried to retaliate against Hall, falsely claiming that Hall was had 18 absences.  Ex. 1, *Hall Depo T.R. Vol. I*, at page 111.  Holstein was basing her alleged absences on "Card Swipes". Ex. 1, *Hall Depo T.R. Vol. I*, at page 111.  It was customary for employees to walk in at the same time as other employees, it was a common practice as cards where not always swiped and management, such as Hall, didn't really need to swipe in because the worked so many hours. Ex. 1, *Hall Depo T.R. Vol. I*, at pages 111-

4

13.  In fact, Amber Hall was the only employee that was questioned about swipes as all other Group Leaders, mainly male, didn't have to be at the plant until 6:45 a.m. while Hall was required to be earlier, and work longer. Ex. 1*, Hall Depo T.R. Vol. I*, at pages 114-16.  When Amber Hall finally had enough, she complained to corporate HR manager Will Smith who called Hall's concerns – disturbing suggesting she deal with now Plant Manager Walter Thomas. Ex. 1*, Hall Depo T.R. Vol. I*, at pages 120.   The conditions got worse leading to Hall telling Gestamp HR (and Plant Manager Lezanic) about her declining health: throwing up, migraines, exhaustion, body aches, earaches, diarrhea, night sweats, and anxiety. Ex. 1*, Hall Depo T.R. Vol. I*, at pages 131-35.  After Hall additional complaints Holsten

Hall did get to meet with Walter Thomas.  Hall discussed the unfair treatment, the harassing that she was receiving for dating Korey Blimke, and explained to Walter Thomas how the constant change of schedule, the constant calls to her at home, the constant threats over her appearance (make-up, hair, blouses) were affecting her physical health.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 121-28.  Holstein continued to make it hard for Hall, again treating her different based on her gender: staring at her in a sexual manner, indicating she didn't need gum because Holstein did not want to kiss Hall, forcing Hall to be dressed up with makeup, nice hair, etc., not allowing Hall to talk to men for more than ten minutes, made efforts to keep Hall way from male co-workers, knowing intimate details of Hall's personal life like where she was going, who she was with, where she went, etc.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 145-48, 155-56.  Holstein had photos taken of Amber Hall. Ex. 1*, Hall Depo T.R. Vol. I*, at pages 147.  None of these demands

were made of male employees, not of this stalking was completed on male employees. Hall's complaints were not taken seriously at all.

On December 3, 2016, Hall had an anxiety attack at work and was taken out of the Gestamp facility in an ambulance.  See, *Ex.30, Page 1, Paragraph 7*. Hall's physician placed her on FMLA from December 4 to December 17, 2016, in order to get treatment for her acute anxiety stemming from her PTSD.  Ex. 2, *Hall Depo T.R. Vol. II*, at page 19, and Ex. 19.  Hall continued to receive medical treatment for anxiety from her PTSD after she returned from FMLA.  Ex. 6, *Gestamp Return To Work / Modified Duty Certification,* Ex. 19.

Hall suffered another anxiety attack at work on January 17, 2017. *Id*., *Ex.30, Page 1, Paragraph 9.* Hall was again placed on FMLA leave from January 17 until March 19, 2017. See, *Ex.30, Page 1, Paragraph 10*. She continued to receive treatment and therapy for her PTSD anxiety during this time. Ex. 2, *Hall Depo T.R. Vol. II*, at page 10-12, Ex. 4 *Letter from Sarah J. Smith, MA LCP*.  Hall had a known medical condition of anxiety and PTSD diagnosed by Dr. Bernie Grose.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 37-38.  She received counseling from Sarah Smith. Ex. 1*, Hall Depo T.R. Vol. I*, at pages 38, and Ex. 19. The treatment, and lack of concern over Hall's complaints, resulted in Hall being transported out of Gestamp on ambulance on two occasion suffering from acute anxiety. Ex. 1*, Hall Depo T.R. Vol. I*, at page 174, 184.  These work incidents leading to the acute anxiety forced Hall on FMLA leave (twice).  Ex. 1*, Hall Depo T.R. Vol. I*, at page 18, Ex. 19.  Hall first took off two weeks on FMLA leave and returned to work around December 16, 2016, Gestamp was clearly aware of the medical condition and reason for FMLA.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 184-88, Ex. 19.  Upon return Hall wanted to use some

6

earned vacation, which was rejected by Holstein stating that Hall had to do evaluations, so Hall was forced to come in over her vacation to work and did.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 186-87.

Hall informed Scott Hughes ("Hughes" hereinafter) that she was going to be off work for medical issues.  Ex. 2, *Hall Depo T.R. Vol. II*, at page10-11.  Hughes asked if Hall was doing well and told Hall to stay in contact. Ex. 2, *Hall Depo T.R. Vol. II*, at page 10-11. Hughes received Hall's FMLA papers and knew that she was out for medical reasons. Ex. 2, *Hall Depo T.R. Vol. II*, at page 10-12, Ex. 4 *Letter from Sarah J. Smith, MA LCP*.  Hughes received a Feb. 15, 2017 letter from Sarah J. Smith, MA LCP indicating that Hall was still in treatment.  Ex. 4 *Letter from Sarah J. Smith, MA LCP*.  Hall even had communicated with Hughes via test message that Hall did in fact bring in her FMLA paperwork and wanted to ensure Hughes received the same.  Ex. 5, *Text between Hall and Hughes*.

Abruptly Hughes contacted Hall to incorrectly inform her that her FMLA was up. Ex. 2, *Hall Depo T.R. Vol. II*, at pages 13-16.  Hughes told Hall he sent her a certified letter (which she did not get). Ex. 2, *Hall Depo T.R. Vol. II*, at page 13.  This caused Hall to have to rush to her doctor to get medically cleared to return to work on March 17, 2017, when she, in fact, had more FMLA to use (*infra*.) and only on a day or so warning.  Ex. 2, *Hall Depo T.R. Vol. II*, at pages 13-15.  Hall, confused, reminded Hughes that Hughes had informed Hall she had three months of FMLA leave but had only used two months. Ex. 2, *Hall Depo T.R. Vol. II*, at pages 14-15.  Regardless, Hall was forced to get a return to work authorization to prevent from being terminated from her job.  See, Ex. 6, *Gestamp Return To Work / Modified Duty Certification*, Ex. 7, *Hughes March 9, 2019 letter to Hall*.

In Hugues letter to Hall he incorrectly demands she return to work on March 17, 2017 or her position will be filled by someone else. Ex. 7, *Hughes March 9, 2019 letter to Hall*. This letter, worded more like a termination letter as it sets out COBRA benefits and other benefits common with termination, states that Hall must return to work or face termination. *Id*.  Hughes based his calculation on an incorrect calculation oh Hall's FMLA leave, using a 40 hour a week "formula" not an average hour a week that Hall actually worked formula. See, Ex. 8 *Gestamp's printout of FMLA leave for Hall*.  Hughes had miscalculated Hall's FMLA[1].  Thus, while it was suggested in the March 9, 2017 that Hughes didn't expect Hall to return, she was forced to get her provided to allow her to return on March 17, 2017 or face certain termination. Ex. 2, *Hall Depo T.R. Vol. II*, at pages 13-15.  Hall was told she could not use intermittent medical leave.  *Hall Depo T.R. Vol. II*, at page 23.  Thus; Hall was denied an accommodation as it was clear that her physician had stated in the FMLA documentation that Hall would experience flare ups and it would be medically necessary for Hall to be absent from work during the flare-ups.  See, *Ex.19 at page 3*.

While Hall was out on her second FMLA leave things changed at Gestamp:

      a.  Aaron Lambert filled in form Hall as group leader;

      b.  Hall was informed that Kenneth Suprenant had recited Aaron Lambert for the position; and,

      c.  Aaron Lamber had assumed Hall's role and took her desk.

*Hall Depo T.R. Vol. II*, at pages 31-34

---

[1] Hughes used a "40 hour" formula to calculate Hall's FMLA time when the formula should have been based on Hall's average weekly hours work to get a correct 12 week calculation.

More changes were apparently after Hall returned from her second FMLA leave on March 19, 2017:

    a.  First, Hall was told nothing had changed;

    b.  Hall had no control over her team, Aaron Lambert assumed control;

    c.  Aaron Lambert was directing Hall's team over the radio;

    d.  Hall wasn't allowed into meetings she was normally allowed;

    e.  Aaron Lambert began giving Amber Hall directions;

    f.  The higher-level management team wouldn't communicate with Hall and directed her actions though Lambert;

    g.  Lambert was directed to watch Hall, and check in on her;

    h.  Lambert was reporting Hall's every move to upper management;

    i.  Hall was continuing to be ignored by upper management and only got direction from Lambert;

    j.  Lambert as close with upper management in Rusty Mossberger, Walter Thomas and Kenneth Suprenant and group were out drinking together often;

    k.  Hall was questioned about projects she wasn't permitted to work on; and,

    l.  Generally not made part of the day to day work environment like was prior to leave.

*Hall Depo T.R. Vol. II*, at pages 22-60.

Then, suddenly, about a month after returning from disability/FMLA leave, Hall was terminated.  Reason? She said, "maybe one day I'll have a butt like yours".  *Hall Depo T.R. Vol. II*, at page 60. And was terminated for violation a sexual harassment policy that was rarely, if ever, enforced.

The reason for termination was pretextual.

Hall was terminated for saying "Maybe one day I'll have a butt like yours".   *Hall Depo T.R. Vol. II*, at page 60.  The comment was directed towards Erica Haynes ("Erica" hereinafter) who laughed it off and, "popped her butt out", rubbed her butt then said "I know it's nice. I ride horse to keep in shape."   *Hall Depo T.R. Vol. II*, at pages 62-63. Erica then said to Hall "but if I had boobs like yours, I would have it made."   *Hall Depo T.R. Vol. II*, at pages 63.   This was a lighthearted conversation that Erica didn't even report to Human Resources.  What happened is Erica got upset when Hall denied her vacation pay. See, Ex. 14, April 14, 2017 Memorandum (Hall explains why she couldn't approve Erica's vacation – it would have been in violation of the 10% out policy). See, Ex. 9 *Hall Statement on incident*.  Even Erica stated that she though Hall had an issue with her because Hall denied her vacation.  See, Ex. 11 *Statement of Erica Haynes*.  In fact, the statement was not even drafted by Erica.  Instead Scott Hughes took the statement on April 21, 2017, wrote if for Erica, and had Erica sign it on May 11, 2017 – about three weeks later. See, Ex. 11 *Statement of Erica Haynes.*  Scott Hughes the drafted up another statement for Erica 3 days later, on April 24, 2017 for her to sign (again, three weeks later on May 11, 2017).  See, Ex. 12 *Second Statement of Erica Haynes*.  During litigation, Gestamp drew up a third statement for Erica to sign, this time called Affidavit of Erica Haynes – here Erica admits that she didn't go to HR on the "butt" comment, but Kenneth Suprenant talked Erica into going to HR to file the complaint against Amber.  See, Ex. 13, *Erica Haynes Affidavit signed July 11, 2019* (During litigation). On April 25, 2017 Hughes terminated Hall for saying "maybe one day I'll have a butt like yours".  *Hall Depo T.R. Vol. II*, at page 60, See, Ex. 14, *Termination Meeting*.  Notably absent from this meeting was

Kristina Dodd, a female who worked in the Human Resources office who Amber Requested to be in the room.  Ex. 9, 10, and 14.  Notably present in the room were termination was decided was Russell Mossberger and Kenneth Suprenant who had no firsthand knowledge of the incident. See, Ex. 14.

Hall had wanted Kristian Dodd ("Dodd" hereinafter) to be in the meeting because Hall knew Dodd got all the facts. Hall had recorded an exchange of the parties.  The transcript reveals as follows:

a.  First it was clear that Erica's main complaint was about the denied vacation, not the "butt" comment.

b.  Hall explained that she was "over 10" meaning she couldn't approve another person on her team for a day off because it would place Hall's team with 10% or more of its member out of work which would have been a policy violation;

c.  However, Hall also explained that Erica can have her denial overridden by Suprenant – which was policy – and Erica did get her vacation day;

See, Ex. 15, *Transcript of conversation between Hall and Dodd* (Work product has been redacted).

Even Hughes agreed that Hall couldn't have allowed Erica to take the vacation day without further approval.  See, *Ex. 26 Depo. T.R. Scott Hughes*, pages 61-61.  Yet, used a "sexual harassment policy that was rarely followed to terminate an employee hardly a month off disability leave.  Gestamp to major issue with Hall saying a "Maybe one day I'll have a butt like yours" but not with countless other sexual harassment claims.  *Hall Depo T.R. Vol. II*, at page 60.  The following are just a few examples of the sexual harassment claims Gestamp didn't find offensive enough for actions:

a. Rhonda Holbert complained being sexually harassed by Bill Hardman, Bill Hardman was not terminated, he was only moved to a different location of the plant.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 71-72;

b. The same Bill Hardman that Hall complained about when Bill Hardman told Hall he liked when Hall sneezed because it made he nipples get hard, and made comments about how Bill Hardman would like to bend Amber over and have sex with her.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 71-72';

c. Likewise, Mark Chandler was making Hall feel uncomfortable by sending her notes, following Hall around the plant without reason and as suspected to be the person that broke into Hall's home.  Ex. 1*, Hall Depo T.R. Vol. I*, at pages 73-74.   Mark Chandler was not terminated for his actions leading to Hall's complaint.  Ex. 1*, Hall Depo T.R. Vol. I*, at page 74.  Despite Hall providing proof of the creepy letters.  *See*, Ex. 3, Letters wrote to Hall by Chandler;

d. Hall had previously filed a complaint of sexual harassment against Barry Holstein. Holstein was plaintiff's supervisor.  Holstein made request to Hall for dinner and made inappropriate comments about her sex life leading Hall to file a complaint on Mr. Holstein. Holstein asked Hall out for drinks and dinner, over which he said they could discuss her future opportunities at the plant. Hall declined this invitation. Holstein was not disciplined for his actions. Ex. 30, Page 1, Paragraph 11.

e. Gestamp has a history of lover looking sexual harassment complaints when women complaint about sexual harassment In Shawn Waters Affidavit, Ms. Waters identifies the following incidents:

12

i.   Antione Anderson (male) propositioned Sara Cook (female) for sexual relations while Sara Cook was a subordinate to Antione Anderson;

ii.   Kelly Carroll reported the Anderson/Cook sexual relationship to Scott Hughes;

iii.   Antione Anderson didn't face any discipline or investigation;

iv.   Antione Anderson constantly propositioned female workers for sexual favors to which was common knowledge;

v.   Antione Anderson asked me [Shawn Waters, female], on a weekly basis, when I'm going "black". Suggesting that I have sex with a black man - Antione Anderson is a black man;

vi.   Women that did sleep with Antione Anderson got promoted such Sara Cook, and Erica Haynes. I have personal knowledge that Erica Haynes did sleep with Antione Anderson. Antione Anderson was a superior to Erica Haynes;

vii.   Erica Haynes also had sexual relationships with Joel Jones, and Aaron Lambert [Joel Jones and Aaron Lamber were also Gestamp employees];

viii.   Antione Anderson recruited a female named Leann Hemingway from 3rd shift Lasers department, to first shift quality. Antione Anderson was having a sexual relationship with Leann Hemingway and allowed her to come in to work when she wanted, Antione Anderson also adjusted Leann Hemingway's

13

time on her clock in to show that she would appear on time when she was not. Antione Anderson would sexually rub on her shoulders during working hours in front of the whole department;

ix. I have personal knowledge that Bill Hardman was charged with sexual harassment while employed at Gestamp, namely Rhonda Holbert. Bill Hardman was not fired for the sexual harassment and was permitted to keep his job. I know personally this was also reported to Human Resources.

x. I [Shaun Waters] was personally sexually harassed by Ken Brooks. That harassment was reported to Scott Hughes. Hughes didn't terminate Ken Brooks. I personally know that this was Ken Brooks' third complaint for sexual harassment at Gestamp. The first being a female name Haley (last name escapes me) (Haley was "air humped" by Ken Brooks), and a second female, then myself. Ken Brooks is still working a Gestamp and is close with Antione Anderson;

xi. Many supervisors at Gestamp knew about my complaints as to the sexual harassment forced upon me by Ken Brooks including David Underwood, Jimmy Rolland, Sandra King, Antione Anderson, Scott Hughes, and John Fields;

xii. The sexual harassment Ms. Waters experienced by Ken Brooks was reported to Human Resources prior her evaluation. She had

always got 4-5s on her evaluations.  She was provided 2-3s on her evaluations after the sexual harassment was reported;

xiii.   I [Shaun Waters] have personal knowledge of Antione Anderson "dirty dancing" with subordinate female employees and purchasing drinks for them a Christmas Party 2018 in front of the whole company, including Scott Hughes.  Antione Anderson was not disciplined; and,

xiv.   Antione Anderson also told me [Shaun Waters] personally to get Kelly Carroll to go out on a date with him.  Kelly Carroll declined several times.  Then Antione Anderson told me personally that he only needed "20 minutes" with Kelly Carroll implying that he just wanted to have sex with her.  *See*, Affidavit of Shaun Walters, filed herein, Docket Entry No.: 83 (11/20/2020) (Ex. 26 herein).

b.   Shondell Houston, in her affidavit, also identify known sexual harassment claims reported to HR wherein no action was taken:

i.   Corey Myrick was in a sexual relationship with a subordinate female named Stacy Eyler who worked in quality control.  Corey Myrick openly talked about the sexual relationship and I know for a fact that Scott Hughes knew about the relationship.  I personally reported [to HR] that Corey Myrick was in a sexual relationship with a subordinate (Stacy Eyler), and Corey Myrick became intoxicated and assaulted her, and strangulated her outside work and was arrested.  I told Scott Hughes about the improper sexual

15

relationship and about the attack.   Scott Hughes did nothing about the incident.  Scott Hughes allowed Corey Myrick to come back to work;

ii.   Kip Wiseman, plant manager, was having a sexual relationship with a female subordinate as well, Carla Donahue.  I told Kip Wiseman that I didn't want the girl he was having sex with/living with (Carla Donahue) on my floor because she knew nothing about quality at all.  Kip Wiseman wanted to give her a job because he was having sex with her and living with her.  I personally asked Scott Hughes about the inappropriate relationship between Kip Wiseman, plant manager, and subordinate Carla Donahue having an open sexual relationship, and living together, Scott Hughes just smiled at me, and walked on by.  Nothing was done by Scott Hughes or Gestamp about the relationship that per the handbook was improper as Carla Donahue was a subordinate to Kip Wiseman;

iii.   All my [Houston's] complaints to Human Resources fell on deaf ears.  Scott Hughes never took any complaint wherein a female was complaining about sexual harassment issue from a man serious, unless he wanted to; and, in my experiences, and to my personal knowledge and observations, neither Gestamp, nor Hughes took disability concerns of female employees serious, or FMLA request from female employees serious.  Gestamp and

16

Hughes demonstrated a pattern of overlooking sexual harassment complaints when they didn't want to get rid of the person that was accused, and demonstrated a pattern of demoting or terminating employees that took time off for disability leave or FMLA leave. I experienced this personal as stated above;

iv. Gestamp let Antoine Anderson get away with sexual harassment on an almost daily basis. There were complaints about Antoine Anderson sexual harassment all the time. I personally know that sexual harassment complaints were filed upon Antione Anderson on numerous occasions and Scott Hugues ignored them all. I personal witnessed Antione Anderson harass Darlene Perry. I personally went with Ms. Perry to complaint to Scott Hughes about Darlene Perry being sexually harassed by Antione Anderson, nothing was done, no investigation was completed. So, I was actually in front of Scott Hughes with Ms. Perry explaining the sexual harassments and how it was affecting Ms. Perry and nothing was done to Antione Anderson. Antione Anderson was making sexual comments to Ms. Perry and attempting to get her to engage in sexual acts in which she rejected – this was told to Hughes in my presence by myself and Ms. Perry. Antione Anderson's actions toward Ms. Perry were not welcome and did affect her and caused her anxiety and

distress.   I know that because Ms. Perry told me the same personally;

v.   I [Houston] personally also know that Sara Cook (female), Gestamp employee, also was in a sexual relationship with Antione Anderson.   Antione Anderson approached her with sexual comments and requested sexual favors.  I do also know for a fact personally that Sara Cook did engage in sexual actions including intercourse with Antione Anderson.   I personality reported to Scott Hughes Antione Anderson was sleeping with Sara Cook, nothing was done;

vi.   Antione Anderson also harassed Lisa Stoner.   Lisa Stoner complained about Antione Anderson sexual harassment to Scott Hugues.  I was there when Lisa Stoner complained about Antione Anderson Sexual Harassment to Scott Hugues.   Nothing was done. No complaints, no investigation, and Antione Anderson still didn't get written up or fired;

vii.   At a time, prior to January 1, 2019 HR consisted of Scott Hughes (Head of HR), Katrine Kessler (HR Generalist/Assistant to Hughes), and Heather Dornife (HR Generalist). Erin Lambert, a male (Hourly Employee) and subordinate to Heather Dornife were involved in an open sexual relationship that HR/Hughes know about. Since Heather Dornife was in HR, it is my understanding that she couldn't date/be in a sexual relationship

18

with an hourly employee.  But I personally know she was and that Hugues know about the relationship;

viii. I [Houston] have personal knowledge, and personally observed the following: on one shift, in the afternoon, after lunch, around 1:20 PM – 1:45PM, while I was looking for one of my engineers, I saw Carla Donahue (female) sitting on the lab (sic) of a manager named Bill (I cannot recall his last name).  Carla Donahue was an hourly employee and Bill was a manager/supervisor so a superior to Carla Donahue.  I told Carla Donahue to get off his lap because the action was completely inappropriate.  Both Donahue and Bill laughed at me.  I personally reported the inappropriate actions to Scott Hughes; Hughes did nothing about the actions which were deemed inappropriate according to the Gestamp Handbook. *See*, Affidavit of Shondell Houston, filed herein, Docket Entry No.: 84 (11/20/2020) (Ex. 27 herein).

c. Mike Borrows likewise identified sexual harassment where not action was taken:

i. I [Borrows] have firsthand knowledge that Antione Anderson propositioned Sara Cook for sexual relations while Sara Cook was a subordinate to Antione Anderson, Kelly Carroll reported the relationship to Scott Hughes.  Antione Anderson didn't face any discipline or investigation;

ii. Antione Anderson constantly propositioned female workers for sexual favors to which was common knowledge;

iii. Antione Anderson has sex with Sara Cook in the plant during working hours;

iv. Kenneth Suprenant knew about Antione Anderson's reputation of soliciting employees for sexual relations at work;

v. Kenneth Suprenant was very close with Antione Anderson. The pair were out after work at restaurants and bars all the time. I used to go to out drinking with Kenneth Suprenant and Antione Anderson.  Antione Anderson would talk about the women he slept with at Gestamp.  Kenneth Suprenant knew about Antione Anderson sleeping with subordinates at Gestamp including Sara Cook.  Kenneth Suprenant never reported Antione Anderson;

vi. Thomas Smith was reported to Human Resources for sexual advances on Kelly Carroll.  Both Thomas Smith and Kelly Carroll were Gestamp employees.   Scott Hughes didn't discipline Thomas Smith.

vii. On at least one occasion, I [Borrows] was drinking with Kenneth Suprenant and Antione Anderson after work.  Antione Anderson began inviting subordinates to the bar to come drink with us.  No one thought this was an issue.

viii. I have personal knowledge of Antione Anderson "dirty dancing" with subordinate female employees and purchasing drinks for

them a Christmas Party 2018 in front of the whole company, including Scott Hughes.  Antione Anderson was not disciplined.

ix.   Sexual harassment was common at Gestamp.  Literally everyday there was sexually suggestive comments made.  Too many to even recall.  The whole culture was just sexually suggestive. Comments were made all the time of sexual nature.  Everyone, including Human Resources was very aware of the sexually suggestive culture at Gestamp. *See*, Affidavit of Mike Borrows, filed herein, Docket Entry Nos.: 85 and 87 (11/20/2020 and 11/23/2020) (Ex.29, herein).

d.   Diana D. Williams filed a complaint against Gestamp stating as follows:

i.   During my employment with Gestamp, I was repeatedly exposed to sexual harassment by Mr. Beckner, my superior at Gestamp, including unwelcomed touching and disgusting verbal comments made to her with sexual connotations;

ii.   I [Williams] complained of the same; however, those complaints fell on the deaf ears of Scott Hughes, Human Resources Manager, and no investigation was conducted with regard to my sexual harassment complaints.

iii.   Instead, after I complained about the unwelcomed advances, touching and disgusting sexual comments made by Mr Beckner to me, Scott Hughes and Gestamp took retaliatory action against me and began to levy unwarranted discipline upon me;

21

    iv.  Neither Gestamp, nor Scott Hughes took my sexual harassment claims serious, and didn't investigate my claims;

    v.  At all times during my employment with Defendant Gestamp, there existed an atmosphere and culture at Defendant Gestamp where female employees were treated differently than male employees in all areas, including pay, promotions, harassment and discipline. Men often were not disciplined for sexual harassment;

    vi.  In spite of my complaints, Gestamp and Hughes failed to take any disciplinary action against Mr. Beckner for his improper touching and sexual comments made by him towards me. See, Ex. 29.

e.  Maura Workman identifies sexual harassment issues at Gestamp as well:

    i.  [Workman] went to Scott Hughes (Human Resources), and Kristina Dodd concerning my complaints about being sexually harassed, and complaints about harassment from Carolyn Starcher and Amanda Koehl. I had written statements that I took to Scott Hughes from several people and ignored, not investigated, and not changes were made;

    ii.  Gestamp West Virginia, LLC maintained an atmosphere of sexually suggestive conduct. Sexual comments were made literally all day everyday;

      iii.  Lots of men at Gestamp had sexual relationships with women they managed;

      iv.  Rhonda Holbert showed me pictures of men's penis such as Barry Holstein and Rusty Mossburger. Rhonda Holbert dated and had a sexual relationship with Keith Lemon who was her supervisor, everyone knew about their relationship;

      v.  Rhonda Holbert had a sexual relationship with Marv Bush who was also a supervisor. There are many other examples of men sleeping with women in subordinate positions at Gestamp that escape my memory. However, it was very common and always overlooked;

      vi.  Gestamp simply wanted Amber Hall gone after she went off on leave for the first time. There were comments all over the Plant that Amber Hall was not going to come back after she left. These were made by Carolyn Starcher and even Scott Hughes. *See*, <u>Affidavit of Maura Workman</u>, filed herein, Docket Entry No.: 78 (11/11/2020) (Ex. 32, herein).

f.  Kelly Carroll-Burrows has similar details:

      a.  I was harassed by Kenneth Brunner.  I complained to Kenneth Suprenant about the harassment from Brunner.  Suprenant never complained to HR about Brunner's harassment of me.  Suprenant told me he was going to talk to someone about Brunner's treatment of me.  But nothing ever happened until months after several complaints were

23

made. This is a direct contradiction to Gestamp following their zero-tolerance sexual harassment policy;

b. Gestamp has a reputation of not disciplining men for sexually harassing women.  Personally, I know that Dan Stacy made a sexual comment and gesture that I only got promoted to Team Leader because I was under Ken Huber's desk preforming oral sex on Ken Huebner.  Dan Stacy then made a sexual gesture mimicking oral sex. I reported Dan Stacy to HR.  Scott Hughes was in the HR office at that time I made the report.  Nothing happened to Dan Stacy that I was aware of, he appeared at work the next day.  Dan Stacy wasn't terminated.  *See*, <u>Affidavit of Kelly Carroll-Burrows</u>, filed herein, Docket Entry No.: 87 (12/02/2020) (Ex. 32, herein).

### III.    <u>Facts Contested by Plaintiff Amber Hall</u>

Defendant asserts in "Section II" of its Brief Supporting Summary Judgement that facts are "undisputed".  That is not accurate.  In fact, nearly every "undisputed fact" is disputed. *See*, <u>Affidavit of Kelly Carroll-Burrows</u>, filed herein, Docket Entry No.: 87 (12/02/2020) (Ex. 32, herein), <u>Affidavit of Maura Workman</u>, filed herein, Docket Entry No.: 78 (11/11/2020) (Ex. 33, herein), <u>Affidavit of Mike Borrows</u>, filed herein, Docket Entry Nos.: 85 and 87 (11/20/2020 and 11/23/2020) (Ex.29, herein), <u>Affidavit of Shondell Houston</u>, filed herein, Docket Entry No.: 84 (11/20/2020) (Ex. 27 herein), <u>Affidavit of Shaun Walters</u>, filed herein, Docket Entry No.: 83 (11/20/2020) (Ex. 26 herein), <u>Affidavit of Kristina Dodd</u>,

filed herein, Docket Entry No.: 81 (11/19/2020) (Ex. 34 herein), <u>Affidavit of Amber Hall</u>, filed herein, Docket Entry No.: __ (12/4/2020) (Ex. 35 herein).

### IV.    <u>Summary Judgment Standard</u>

When evaluating the merits of a motion for summary judgment, the Court looks to Rule 56(a) and its progeny to determine whether any genuine dispute of material fact exists in a case. "Summary judgment is  inappropriate  ...    if there exist factual issues that reasonably  may be resolved in favor of either party." *Anderson v. Libertv Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)."[2] Further, "[o]n a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor."[3]

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255 (citing *Adickes*, 398 U.S., at 158-159).

---

[2] *Dickens v. Aetna Life Ins. Co•*. 201 I U.S. Dist. LEXIS 32595 *.  51 Employee Benefits Cas. (BNA) 1502, 2011 WL 1258854 (S.D. W. Va. Mar. 28,201 I)

[3] " ••• [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242,249, 106 S. Ct. 2505, 2511 (1986).

The threshold for summary judgment presents a high hurdle for a moving party in an  employment case where the motive of the Defendant is at issue. At Syllabus Points 3[4] and 4[5] of *Hanlon  v.  Chambers*, the Court established the daunting threshold a defendant must meet to justify summary judgment in an employment discrimination case.

The Fourth Circuit has held that "when there is a close question and reasonable minds could differ when weighing all the facts against the law then summary judgment is inappropriate."[6]  Determinations regarding the motives of the actors particularly ill-suited to resolution on summary judgment. As another court noted in the Southern District of West Virginia, "[w]ith respect to employment and discrimination cases, courts take special care because state of mind, intent, and motives may be crucial elements. The Supreme Court of Appeals of West Virginia explains that summary judgment is often imprudent in discrimination cases that present issues of motive or intent because credibility determinations, the weighing of evidence, and the drawing of legitimate

---

[4] "In most discrimination cases, once a plaintiffs allegations and evidence create a *primafacie* case (showing circumstances that permit an inference of discrimination or an impermissible bias), unless the employer comes forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiffs evidence establishing a *primafacie* case and the emplo yer' s evidence of nondiscriminatory reason reflects a question of fact to be resolved by the fact finder after trial." *Hanlon v. Chambers*, 195 W. Va. 99; 464 S.E.2d 741 (1995)

[5] Although the plaintiff has the ultimate burden of proving elements of the claim of discrimination by a preponderance of the evidence, the showing the plaintiff must make as to the elements of the *primafacie* case in order to defeat a motion for summary judgment is *de minimis*.  In determining whether the Plaintiff has met the *de minimis* initial burden of showing circumstances giving rise to an inference of discrimination, the function of the circuit court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.  It is not the province of the circuit court itself to decide what inferences should be drawn."Syl. pt. 4.

[6] *Walker v. Mod-U-Kraf Homes, LLC.*, 775 F.3d 202 (4th  Cir.2014) (quoting  *Paroline*  879 F.2d  at  105) (severity and pervasiveness of harassment a  question of fact).

inferences from the facts are jury functions, not those of a judge." *Blankenship v. Caterpillar Glob. Mining. LLC*, 964 F. Supp. 2d 578, 580 (S.D. W. Va. 2013). "In most discrimination cases, once a plaintiffs allegations and evidence create a *prima facie* case (showing circumstances that permit an inference of discrimination or an impermissible bias), unless the employer comes forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiffs evidence establishing a *prima facie* case and the employer's evidence of nondiscriminatory reason reflects a question of fact to be resolved by the fact finder after trial." *Hanlon v. Chambers*, 195 W. Va. 99; 464 S.E.2d 741 (1995). Particularly in "complex cases ... where issues involving motive and intent are present," summary judgment should not be utilized as a method of resolution. *See Masinter v. WEBCO Co.,* 164 W.Va. 241, 243, 262 S.E.2d 433, 436 (1980). **Courts must take special care when considering summary judgment in employment and discrimination cases because state of mind, intent, and motives may be crucial elements.** *Williams v. Precision Coil, Inc.*, 459 S.E.2d 329, 338 (W. Va. 1995) (emphasis added).


### V.     ARGUMENT

   a.   <u>Amber Hall as set for a claim pursuant to the West Virginia Human Rights Act for Disability Discrimination, Gender/Sex Discrimination, and Failure to Accommodate Disability</u>

The West Virginia Human Rights Act prohibits discrimination in employment based on sex/disability/failure to accommodate (WV Code Sec. 5-11-1 et seq.).

27

It cannot be disputed that Plaintiff is a member of a protected class (female/disabled).   *Mayflower Vehicle Sys., Inc. v. Cheeks*, 629 S.E.2d 762 (W. Va. 2006).   Likewise, it cannot be disputed that Plaintiff was terminated.   The evidence in the form of deposition transcripts and affidavits establish many factual disputes.   Including but not limited to:   was Hall's termination for her mild comment sufficient for termination under the sexual harassment policy when it was ignored for men, or was it pretextual, did Defendant discriminate against Hall in light of the fact she was terminated only one month after returning from disability / FMLA leave, and did Defendant fail to accommodate when Hall's FMLA documents indicated she was to receive time off when needed.   *See*, Ex. These are all questions of fact for the jury.

There are also questions of fact relevant to the obviously question of did Defendant made an adverse decision concerning the plaintiff; and but for the plaintiff's protected status, the adverse decision would not have been made.   Syllabus point 2, *Conaway v. Eastern Associated Coal Corp.*, 358 S.E.2d 423 (W. Va. 1986); Syllabus point 4*, Mayflower Vehicle Sys., Inc. v. Cheeks*, 629 S.E.2d 762 (W. Va. 2006).   Again, Hall had a budding career with Defendant.   She was promoted. He salary was increasing.   She was getting good reviews.   All that changed when she started having health issues.

i.   <u>The are factual disputes as to Hall's Claim for Disability discrimination.</u>

Plaintiff has presented evidence that the circumstance changed when she returned from disability leave. Hughes told Hall he sent her a certified letter (which she did not get). Ex. 2, *Hall Depo T.R. Vol. II*, at page 13.   This caused Hall to have to rush to her doctor to get medically cleared to return to work on March 17, 2017, when she, in fact, had more

FMLA to use (*infra*.) and only on a day or so warning.  Ex. 2, *Hall Depo T.R. Vol. II*, at pages 13-15.  Hall, confused, reminded Hughes that Hughes had informed Hall she had three months of FMLA leave but had only used two months.  Ex. 2, *Hall Depo T.R. Vol. II*, at pages 14-15.  Regardless, Hall was forced to get a return to work authorization to prevent from being terminated from her job.  See, Ex. 6, *Gestamp Return To Work / Modified Duty Certification*, Ex. 7, *Hughes March 9, 2019 letter to Hall*.

In Hugues letter to Hall he incorrectly demands she return to work on March 17, 2017 or her position will be filled by someone else. Ex. 7, *Hughes March 9, 2019 letter to Hall*. This letter, worded more like a termination letter as it sets out COBRA benefits and other benefits common with termination, states that Hall must return to work or face termination.  *Id*.  Hughes based his calculation on an incorrect calculation oh Hall's FMLA leave, using a 40 hour a week "formula" not an average hour a week that Hall actually worked formula.  See, Ex. 8 *Gestamp's printout of FMLA leave for Hall*.  Hughes had miscalculated Hall's FMLA[7].  Thus, while it was suggested in the March 9, 2017 that Hughes didn't expect Hall to return, she was forced to get her provided to allow her to return on March 17, 2017 or face certain termination. Ex. 2, *Hall Depo T.R. Vol. II*, at pages 13-15.  Hall was told she could not use intermittent medical leave.  *Hall Depo T.R. Vol. II*, at page 23.  Thus; Hall was denied an accommodation as it was clear that her physician had stated in the FMLA documentation that Hall would experience flare ups and it would be medically necessary for Hall to be absent from work during the flare-ups. See, *Ex.19 at page 3*.

---

[7] Hughes used a "40 hour" formula to calculate Hall's FMLA time when the formula should have been based on Hall's average weekly hours work to get a correct 12 week calculation.

While Hall was out on her second FMLA leave things changed at Gestamp:

    a.  Aaron Lambert filled in form Hall as group leader;

    b.  Hall was informed that Kenneth Suprenant had recited Aaron Lambert for the position; and,

    c.  Aaron Lamber had assumed Hall's role and took her desk.

*Hall Depo T.R. Vol. II*, at pages 31-34

More changes were apparently after Hall returned from her second FMLA leave on March 19, 2017:

    a.  First, Hall was told nothing had changed;

    b.  Hall had no control over her team, Aaron Lambert assumed control;

    c.  Aaron Lambert was directing Hall's team over the radio;

    d.  Hall wasn't allowed into meetings she was normally allowed;

    e.  Aaron Lambert began giving Amber Hall directions;

    f.  The higher-level management team wouldn't communicate with Hall and directed her actions though Lambert;

    g.  Lambert was directed to watch Hall, and check in on her;

    h.  Lambert was reporting Hall's every move to upper management;

    i.  Hall was continuing to be ignored by upper management and only got direction from Lambert;

    j.  Lambert as close with upper management in Rusty Mossberger, Walter Thomas and Kenneth Suprenant and group were out drinking together often;

    k.  Hall was questioned about projects she wasn't permitted to work on; and,

I. Generally not made part of the day to day work environment like was prior to leave.

*Hall Depo T.R. Vol. II*, at pages 22-60.

Then, suddenly, about a month after returning from disability/FMLA leave, Hall was terminated. Reason? She said, "maybe one day I'll have a butt like yours". *Hall Depo T.R. Vol. II*, at page 60. And was terminated for violation a sexual harassment policy that was rarely, if ever, enforced. *Infra*.

Gestamp wanted Lambert to replace Hall. Kelly Carroll-Burrows states:

> I had first-hand knowledge that Aaron Lambert was being "stepped up" to take Amber Hall's position as soon as she left on medical leave. Aaron Lambert immediately took over Amber Hall's active role as Group Leader.
>
> I know for certain that Aaron Lambert took over Amber Hall's desk. Amber Hall did have an assigned desk. Amber Hall didn't share her desk with anyone.
> We reported to Aaron Lambert as Group Leader if we had issues, Aaron Lambert had all functions as Amber Hall while she was off and Gestamp was preparing Aaron Lambert to take over for Amber Hall.
>
> I have personal knowledge that Gestamp retaliates against individuals who have disabilities / take FMLA. I was in a meeting where Gary Slater, Production Group Leader, stated that Gestamp needs to find away to get rid of Chris Linville. Chris Linville was out on FMLA for a surgical procedure on his back, or hip. Gestamp didn't want to accommodate any medical issues or accommodate disabilities. The decision was to bring in someone else to take the place of the person with medical issues or disabilities.
>
> I also recall Gestamp wanting to get rid of Percy Hutchinson because he pulled his shoulder trying to pry parts apart and needed to take off on medical leave. Gestamp didn't want to pay Hutchinson for leave and asked employees to find ways to get rid of him.

Suprenant states Aaron Lambert returned to his Team Leader position in lasers department when Amber Hall returned. That is false. Aaron Lambert never returned to that spot, he was always side by side with upper management and went to "launch team". He may have been labeled a Team Leader but he certainly did not work that position after Amber Hall returned. In fact, Aaron Lamber was directing Amber Hall and the team after Amber Hall returned. That was an issue. We didn't know who to answer to: Aaron or Amber.

See, <u>Affidavit of Kelly Carroll-Burrows</u>, filed herein, Docket Entry No.: 87 (12/02/2020)

Former Human Resources personal Kristin Dodd also provided an affidavit as follows:

I observed Scott Hughes and Walther Thomas while Amber Hall was being removed in an ambulance **make remarks to the effect that they hoped she would not be back. On one occasion I overheard Rusty Mossberger speaking with Antoine Anderson and discussing that they did not want Amber Hall to come back**. To my knowledge, the investigation into Amber Hall's complaints did not involve taking formal statements. The investigation consisted of casually asking Barry Holstein if there are any issues.

I familiar with some of the issues Amber Hall experienced at Gestamp West Virginia, LLC. She was working a lot of hours. On two occasions I overheard Barry Holstien yell at Amber Hall.

On two occasions I overheard Barry Holstein being verbally abusive to Amber Hall. I could hear him yelling at her and berating her through closed doors – it was that loud.

**One of Amber Hall's complaints concerned her medical concerns and possible disability**

Amber Hall left not once, but twice in an ambulance from work due to extreme stress and anxiety to the point she could not walk.

It appeared to me that Gestamp West Virginia, LLC did not properly track Amber Hall's FMLA hours. Scott Hughes sent letter stating that her FMLA was expiring. Amber denied

receiving it.  Scott Hughes claimed that he actually tried to call her.

I personally handed Amber Hall a "print out" evidencing that no party at Gestamp West Virginia, LLC even kept track of available FMLA hours during the time she was out of work on FMLA.

I personally overheard a conversation between Antoine Anderson and Rusty Mossberger.  **Antoine Anderson had asked Rusty Mossberger when Amber Hall would be returning to work from FMLA and that Rusty Mossberger had said, "Hopefully never!"**

I recall Rusty Mossberger came to my office to ask me if I knew when Amber Hall would be returning from FMLA. I stated that I didn't know.  Mossberger responded **with words to the effect   that he (Mossberger) wished he (Mossberger) did know so that they (Gestamp West Virginia, LLC) could hurry up and get rid of Amber Hall**.

I personally witnessed Amber Hall's meeting with Scott Hughes, Kenneth Suprenant and Rusty Mossberger over the alleged Erica Haynes sexual harassment complaint. I can attest that Gestamp West Virginia, LLC, Mossberger, Suprenant and Hughes only focused only on what allegedly happened with Erica Haynes. Gestamp West Virginia, LLC, Mossberger, Suprenant and Hughes created a story/theme that Amber Hall had committed an extremely egregious violation of the Sexual Harassment policy.  They refused to consider any sexual harassment complaints by Amber Hall or that Amber Hall was a in regard to the Erica Haynes complaint.

To my knowledge, Erica Haynes did not complain to Human Recourses regarding Amber Hall's alleged conduct.

In the meeting with Amber Hall, Scott Hughes claimed to have witness statements.  When Amber asked for them, Scott Hughes did not produce them.  Scott Hughes later typed statements and brought individuals in to sign them.

See, Affidavit of Kristina Dodd, filed herein, Docket Entry No.: 81 (11/19/2020) (Ex. 34

herein) (emphasis added)

33

**Courts must take special care when considering summary judgment in employment and discrimination cases because state of mind, intent, and motives may be crucial elements.** *Williams v. Precision Coil, Inc.*, 459 S.E.2d 329, 338 (W. Va. 1995) (emphasis added).  Here you have upper management stating they hope Hall never comes back from a serious disability, already picked her replacement, and did all they could to run her off when she got back.  <u>Affidavit of Kristina Dodd</u>, filed herein, Docket Entry No.: 81 (11/19/2020), <u>Affidavit of Kelly Carroll-Burrows</u>, filed herein, Docket Entry No.: 87.

<div align="center">

ii.  <u>Hall can prove disparate treatment between men and women at Gestamp inferring gender discrimination</u>.

</div>

As stated, though this response, men and women had different rules at Gestamp.  The reason for termination was pretextual.  Hall was terminated for saying "Maybe one day I'll have a butt like yours".  *Hall Depo T.R. Vol. II*, at page 60.  The comment was directed towards Erica Haynes ("Erica" hereinafter) who laughed it off and, "popped her butt out", rubbed her butt then said "I know it's nice. I ride horse to keep in shape." *Hall Depo T.R. Vol. II*, at pages 62-63.  Erica then said to Hall "but if I had boobs like yours, I would have it made." *Hall Depo T.R. Vol. II*, at pages 63.  This was a lighthearted conversation that Erica didn't even report to Human Resources.  What happened is Erica got upset when Hall denied her vacation pay. See, Ex. 14, April 14, 2017 Memorandum (Hall explains why she couldn't approve Erica's vacation – it would have been in violation of the 10% out policy). See, Ex. 9 *Hall Statement on incident*.  Even Erica stated that she though Hall had an issue with her because Hall denied her vacation.  See, Ex. 11

*Statement of Erica Haynes*.  In fact, the statement was not even drafted by Erica.  Instead Scott Hughes took the statement on April 21, 2017, wrote if for Erica, and had Erica sign it on May 11, 2017 – about three weeks later. See, Ex. 11 *Statement of Erica Haynes*. Scott Hughes the drafted up another statement for Erica 3 days later, on April 24, 2017 for her to sign (again, three weeks later on May 11, 2017).  See, Ex. 12 *Second Statement of Erica Haynes*.  During litigation, Gestamp drew up a third statement for Erica to sign, this time called Affidavit of Erica Haynes – here Erica admits that she didn't go to HR on the "butt" comment, but Kenneth Suprenant talked Erica into going to HR to file the complaint against Amber.  See, Ex. 13, *Erica Haynes Affidavit signed July 11, 2019* (During litigation). On April 25, 2017 Hughes terminated Hall for saying "maybe one day I'll have a butt like yours".  *Hall Depo T.R. Vol. II*, at page 60, See. Ex. 14, *Termination Meeting*.  Notably absent from this meeting was Kristina Dodd, a female who worked in the Human Resources office who Amber Requested to be in the room.  Ex. 9, 10, and 14. Gestamp to major issue with Hall saying a "Maybe one day I'll have a butt like yours" but not with countless other sexual harassment claims.  *Hall Depo T.R. Vol. II*, at page 60. Gestamp wanted Hall gone and violated her W.Va. Human Rights in doing so.  Gestamp used its Sexual Harassment policy to terminate Hall for a "butt" comment that wasn't even complained of by Erica until she was escorted into HR to file the "complaint." *Supra*. Gestamp had a pattern of favoring men over women when it came to sexual harassment. See, Pages 12-14 above for dozens of examples.

b.    Hall has established Retaliatory Discharge in Violation of FMLA/FMLA Interference

*Ainsworth v. Loudon Cty. School Bd.*, 851 F. Supp.2d 963, 975, (E.D. Va. 2012) held "[t]o state a claim of interference with FMLA rights, the plaintiff must establish that "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." (internal citations omitted).  The following is not disputed:

1.    Plaintiff was eligible for and did request FMLA leave.

2.    Defendant is an employer as defined by FMLA.

3.    Plaintiff was entitled to leave under FMLA.

4.    Plaintiff did give her employer notice of his intention to take leave.

What is disputed is did Defendants also denied Plaintiff with benefits to which she was entitled and/or did Defendants terminate Plaintiff in violation of FMLA. Hughes only allowed Halls FMLA to equal 40 hours a week.  See, Ex. 8.  This is incorrect.  Hall was required to have an accounting of FMLA equal to the hours work on average over Hall's average work week.  Hall's workweek was well more than 40 hours.  Yet Hughes counted down her hours based on a 40-hour work week costing her approximately 88 hours. Plaintiff was prejudiced as she failed to receive full FMLA benefits. Kristina Dodd stated:

> It appeared to me that Gestamp West Virginia, LLC did not properly track Amber Hall's FMLA hours.  Scott Hughes sent letter stating that her FMLA was expiring.  Amber denied receiving it. Scott Hughes claimed that he actually tried to call her.

> I personally handed Amber Hall a "print out" evidencing that no party at Gestamp West Virginia, LLC even kept track of available FMLA hours during the time she was out of work on FMLA.
>
> I personally overheard a conversation between Antoine Anderson and Rusty Mossberger.  Antoine Anderson had asked Rusty Mossberger when Amber Hall would be returning to work from FMLA and that Rusty Mossberger had said, "Hopefully never!"

. See, <u>Affidavit of Kristina Dodd</u>, filed herein, Docket Entry No.: 81 (11/19/2020).

The statement from Dodd provides direct evidence that not only was Hall's FMLA mis-calculated, but also, upper management personnel Anderson and Mossberger were celebrating her misfortune and make her pay for it when coming back.  See, Pages 30-31, herein.

Here, Hall did engage in protected activity (taking and/or requesting of FMLA leave), that the employer took adverse action against her (failed to allow all benefits and/or terminated her and/or retaliated against her for requesting FMLA leave), and the above adverse action was casually connected to the plaintiff's protected activity. *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).  Defendants explanation, if any, is pretext for FMLA retaliation.  *Yashenko v. Harrrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006), *Supra*.

Hall was discharged in exercise of her FMLA rights and/or constitutional rights was a substantial or a motivating factor for her discharge. Hall need not show that the exercise of the constitutional right(s) was the only precipitating factor for the discharge, but on that

she has suffered harm – termination.   The works overheard by Dodd coupled with the mistreatment of Hall on her return was only second to the extremely weak reason for her termination, "maybe one day I'll have a butt like yours".   *Hall Depo T.R. Vol. II*, at page 60.

<div style="margin-left: 50%">

AMBER D. HALL,

Plaintiff by Counsel,

Respectfully submitted,

</div>

_____
D. Adrian Hoosier, II (WVSB# 10013)
Hoosier Law Firm, PLLC
213 Hale St., Suite 100
Charleston, WV  25301
Telephone:  (681) 265-5000
Facsimile:  (681) 265-5001