**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

| | |
|---|---|
| **AMBER D. HALL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **GESTAMP WEST VIRGINIA, LLC,** | )    **Civil Action No.:  2:20-cv-00146** |
| **KENNETH SUPRENANT & SCOTT** | ) |
| **HUGHES,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## FIRST AMENDED INTEGRATED PRETRIAL ORDER

COME NOW, the parties pursuant to L.R. Civ. P. 16.7(b), and Rule 26(a)(3) Federal Rules of Civil Procedure, and submits this First Amended Integrated Pretrial Order:

1.      **Fed. R. Civ. P. Rule 26(a)(3) Pretrial Disclosures –**

         **Plaintiff's Fed. R. P. Rule 26(a)(3) Pretrial Disclosures**

   a.  Rhonda Holbert, contact unknown (Plaintiff plan to have her served at her work location) (presented as live witness);

   b.  Plaintiff, Amber Hall, c/o Hoosier Law Firm, 213 Hale St., Charleston, WV 25301 (304) 767-9482 (presented as live witness);

   c.  Russel Mossberger, c/o Defendant/Counsel for Defendant (presented as live witness);

   d.  Kenneth Suprenant, c/o Defendant/Counsel for Defendant (presented as live witness);

   e.  Scott Hughes, c/o Defendant/Counsel for Defendant (presented as live witness);

   f.  Chris Groom, c/o Defendant/Counsel for Defendant (presented as live witness);

   g.  Walter Thomas, c/o Defendant/Counsel for Defendant (presented as live witness);

h.  Erica Haynes, c/o Defendant/Counsel for Defendant (presented as live witness);

i.  Jason Barrett, c/o Defendant/Counsel for Defendant (presented as live witness);

j.  Aaron Lambert, c/o Defendant/Counsel for Defendant (presented as live witness);

k.  Antione Anderson, c/o Defendant/Counsel for Defendant (presented as live witness);

l.  Carolyn Starcher, 304-533-3206 (live witness);

m.  Zachary Meyers, CPA; and,

n.  All witnesses named by Defendant herein.

o.   Additional witnesses that maybe called for rebuttal, but Plaintiff does not currently have contact information for include the following:

     i.  Donald Smith;
     ii.  Paul Lezanic;
     iii.  Kenneth Huebner;
     iv.  Heather Campbell;
     v.  Josette Saunders;
     vi.  Bonnie Kerola;
     vii.  Justin Lavendar;
     viii.  Nathaniel Bodie;
     ix.  Scott Rogers;
     x.  Billy Ray.

**Plaintiff's Exhibit List**

p.  All documents produced by Defendant and Plaintiff;

     i.  Deposition transcripts, namely just Kenneth Suprenent to the extent he will not be available for trial (live) and Plaintiffs would only use pages 12 and thereafter;

     ii.  Text Messages/Facebook messages produced by Plaintiff, specifically Plaintiff's messages with Erica Hayes, Rhonda Holbert,

2

Chris Grooms, and all of the text messages that were provided in "group format";

iii.   Plaintiffs Medical Records produced;

iv.   Recordings provided by Plaintiff (all of them);

v.   Unemployment file (statements made therein);

vi.   Email and "Complaints" provided by Plaintiff (Plaintiff filed three formal complaints with Gestamp, those Plaintiffs plans to introduce);

vii.   All affidavits filed herein;

viii.   Human Rights Commission documentation provided (the statements from Plaintiff and other statements memorized in the HRC file that was produced in whole to Defendant);

ix.   Memorandum(s) provided by defendant, specifically the "Memorandums" signed by Erica Haynes, Chris Grooms, Rhonda Holbert, and Scott Hughes);

x.   Affidavits / Declarations provided by defendant; and,

xi.   All documents Defendant's introduce and/or name herein.

## Defendants' Fed. R. Civ. P. 26(a)(3) Disclosures

## Defendants' Witness List

## Witnesses Defendants Expects to Present

1.   Amber Hall

2.   Chris Groom

3.   Erica Haynes

4.      Barry Holstein

5.      Scott Hughes

6.      Aaron Lambert
        149 Summit Ridge Road
        Hurricane, WV 25526
        (304) 687-4297

7.      Rusty Mossberger

8.      Scott Rogers

9.      Carolyn Starcher

10.     Kenneth Suprenant

11.     Walter Thomas

12.     Roger Griffith (expert)

<u>Defendant May Call the Following Witnesses If the Need Arises</u>

1.      Antoine Anderson

2.      Jason Barrett

3.      Heather Campbell
        127 Warwick Ct.
        Elyria, OH 44035
        (304) 514-8123

4.      Rhonda Holbert

5.      Bonnie Kerola

6.      Justin Lavender

7.      Paul Lezanic

8.      Nancy Paxton

9.      Billy Ray

10.     Donald Smith

11.     Will Smith

12.     Stephen Thomas

    13.    Non-objectionable Witnesses Listed by Plaintiff

    14.    Witnesses necessary to authenticate exhibits

    15.    Witnesses for Rebuttal or Impeachment

    16.    Defendants reserve the right to supplement this list prior to trial.

**Defendants' Exhibit List**

Defendants expect to offer the following exhibits:

    1.    Admissible portions of depositions of Amber Hall (with exhibits)

    2.    Plaintiff's Application for Employment  (DRFP 231-234)

    3.    Plaintiff's Offer Letter

    4.    Gestamp West Virginia's Employment Handbook (DRFP 113-159)

    5.    Plaintiff's Handbook Acknowledgement Receipt Forms (DRFP 11, 186)

    6.    Plaintiff's Group Leader Job Description

    7.    Plaintiff's Supervisor Offer Letter

    8.    Plaintiff's March 11, 2016 Job Expectations Memorandum

    9.    Barry Holstein's Notes regarding Plaintiff  (DRFP 305-312)

    10.    October 26, 2016 Performance Improvement Memorandum (DRFP 296-300)

    11.    October 26, 2016 Operations Group Leader Job Description

    12.    October 26, 2016 Job Description Review Memorandum

    13.    Plaintiff's November 26, 2016 First Corrective Action Report\

    14.    Plaintiff's October 26, 2016 Memorandum

    15.    Plaintiff's October 27, 2016 Memorandum

    16.    Plaintiff's Email to Walter Thomas of November 3, 2016 (DRFP 80-85)

    17.    Plaintiff's FMLA Certification (DRFP 97-100)

    18.    Plaintiff's 12/13/16 Return to Work Certification (DRFP 101-102)

19.     Plaintiff's January 4, 2017 Corrective Action Report (DRFP 77)

20.     Plaintiff's February 15, 2017 FMLA Certification (DRFP 103-106)

21.     Plaintiff's Return to Work Certification (DRFP 108-109)

22.     Scott Hughes March 9, 2017 Letter to Plaintiff (DRFP 112)

23.     Plaintiff's FMLA Tracker (DRFP 110-111)

24.     Letter of April 25, 2017 from Hughes to Plaintiff (DRFP 74)

25.     Erica Haynes April 21, 2017 Statement (DRFP 4)

26.     Memo to File on Amber Hall Interview  (DRFP 2)

27.     Christopher Groom April 24, 2017 Statement (DRFP 6)

28.     Kenneth Bruner Sexual Harassment Investigation (DRFP 313-319)

29.     David Hancock Termination (DRFP 323)

30.     Tommy Mace Sexual Harassment Termination (DRFP 326-329)

**<u>Defendants may offer the following exhibits:</u>**

Defendants note that while it may object to all or part of the following records coming into evidence, it nonetheless, out of an abundance of fairness, must identify these potential exhibits as those Defendants may use according to how certain evidence is allowed before the jury by the Court.  However, by listing these exhibits, Defendants are in no way waiving objections to their admissibility, for whatever reasons.

1.     Plaintiff's Orientation Training Record

2.     Plaintiff's Team Leader Job Description

3.     Plaintiff's Pay Increase Memorandum (DRFP 280)

4.     Barry Holstein Email Correspondence re: TL evals (DRFP 88-90)

5.     Email correspondence regarding Matt Tawney and draft discipline (DRFP (91-93)

6.     Email correspondence regarding Brandon Saunders (DFP 94-96)

7.     Transcript of Conversation between Plaintiff and Scott Hughes (Hall depo., DX19)

8.   Transcript of Conversation between Plaintiff and Barry Holstein (Hall depo., DX23)

9.   Plaintiff's February 15, 2017 Doctor's Note (DRFP 107)

10.   Plaintiff's Chat with Scott Hughes (Hall depo., DX27)

11.   Plaintiff's Notes of April 24, 2017 (DRFP 37-71)

12.   Plaintiff's Submission to Unemployment Appeal Hearing (Hall depo., DX33)

13.   Plaintiff's Text Message Summary (Hall depo., DX34)

14.   Plaintiff's EEOC intake questionnaire and timeline

15.   Transcription of termination meeting (Hall depo., DX43)

16.   Rhonda Holbert April 24, 2017 Statement (DRFP 5)

17.   Erica Haynes April 24, 2017 Statement (DRFP 3)

18.   Cathy McMellon Summary of Termination Meeting (DRFP 1)

19.   Unemployment Compensation Decision (DRFP 12-15)

20.   Plaintiff's Medical Record History (DRFP 211-213)

21.   Plaintiff's 2017, 2018, & 2019 Tax Returns

22.   Plaintiff's Pay Records (DRFP 332-384)

23.   Plaintiff's Journal

24.   Selections of Text Messages and Facebook Messages Provided by Plaintiff

25.   Various charts, graphs, models and other demonstrative evidence.

26.   Calendar of events

27.   Plaintiff's Responses to Defendants' First Interrogatories, Requests for Production of Documents, and Requests for Admission

28.   Declaration of Scott Hughes (with exhibits)

29.   Declaration of Kenneth Suprenant (with exhibits)

30.   Declaration of Rusty Mossberger (with exhibits)

31.   Declaration of Walter Thomas (with exhibits)

32.   Affidavit of Erica Haynes (with exhibits)

33.   Affidavit of Chris Groom (with exhibits)

34.   Affidavit of Rhonda Holbert (with exhibits)

35.   Declaration of Barry Holstein (with exhibits)

36.   Declaration of Aaron Lambert

37.   Declaration of Scott Rogers

38.   Declaration of Carolyn Starcher

39.   Declaration of Heather Campbell

40.   Admissible portions of the depositions taken in this matter

41.   Documents and exhibits necessary for rebuttal or impeachment

42.   Documents listed by Plaintiff to which Defendants do not object

43.   Defendants reserve the right to supplement this list prior to trial.

**<u>Defendants' Objections to Plaintiff's Exhibit List</u>**

a.   All documents produced by Defendant and Plaintiff – Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be used pursuant to Fed. R. Civ. P. Rule 26(a)(3). Therefore, Defendants reserve all objections.

i.   All deposition transcripts - Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be used pursuant to Fed. R. Civ. P. Rule 26(a)(3). Therefore, Defendants reserve all objections.

ii.   Text Messages/Facebook messages produced by Plaintiff - Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be used pursuant to Fed. R. Civ. P. Rule 26(a)(3). Therefore,

Defendants reserve all objections.  Furthermore, Defendants object to these messages because they contain hearsay which does not meet an exception under Rules 801 and 802 of the Federal Rules of Evidence and information which is irrelevant to Plaintiff's claims under Rule 402 of the Federal Rules of Evidence.

      iv.    Recordings provided by Plaintiff - Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be used pursuant to Fed. R. Civ. P. Rule 26(a)(3).  Therefore, Defendants reserve all objections.  Furthermore, Defendants object to these messages because they contain hearsay which does not meet an exception under Rules 801 and 802 of the Federal Rules of Evidence.

      v.    Unemployment file - Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be used pursuant to Fed. R. Civ. P. Rule 26(a)(3).  Therefore, Defendants reserve all objections. Furthermore, Defendants object to these messages because they contain hearsay which does not meet an exception under Rules 801 and 802 of the Federal Rules of Evidence.

      vi.    Email and "Complaints" provided by Plaintiff - - Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be used pursuant to Fed. R. Civ. P. Rule 26(a)(3).  Therefore, Defendants reserve all objections.  Furthermore, Defendants object to these messages because they contain hearsay which does not meet an exception under Rules 801 and 802 of the Federal Rules of Evidence.

      vii.    All affidavits filed herein - Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be

used pursuant to Fed. R. Civ. P. Rule 26(a)(3). Therefore, Defendants reserve all objections. Furthermore, Defendants object to affidavits which were filed and stricken by this Court because Plaintiff failed to disclose the witnesses pursuant to Fed. R. Civ. P. Rule 26(a).

viii.    Human Rights Commission documentation provided - Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be used pursuant to Fed. R. Civ. P. Rule 26(a)(3). Therefore, Defendants reserve all objections. Furthermore, Defendants object to these messages because they contain hearsay which does not meet an exception under Rules 801 and 802 of the Federal Rules of Evidence.

ix.    Memorandum(s) provided by defendant - Defendants object to this exhibit because Plaintiff's vague and overbroad designation fails to identify sufficiently the exhibits to be used pursuant to Fed. R. Civ. P. Rule 26(a)(3).

**2.    Contested issues of Law requiring ruling before trial**

a.    Defendants' Motion for Summary Judgment;

b.    Plaintiff's Motion in Limine Number 1: Exclusion of Testimony or Evidence of Sexual Conduct, Sexually Suggestive Communications, or Intimate Relationships;

c.    Plaintiff's Motion in Limine Number Two: Absence from Work, or Tardiness

d.    Defendants' Motion in Limine to Exclude Inadmissible Hearsay

e.    Defendants' Motion in Limine To Exclude Witnesses Not Timely Disclosed

f.    Defendants' Motion in Limine to Exclude Inadmissible Irrelevant Evidence

g.  Defendants' Motion in Limine to Exclude Inadmissible Evidence Lacking Proper Foundation

h.  Defendants' Motion in Limine to Exclude Inadmissible Irrelevant Evidence Regarding Holstein Treatment

i.  Defendants' Motion in Limine to Exclude Inadmissible Evidence or Prior Alleged Incidents

j.  Defendants' Motion in Limine to Exclude Testimony of Zachary Meyers

k.  Plaintiff intends to file a Motion to Strike Defendant's Designations (all of them);

l.  Plaintiff intends to file a Motion to Reconsider the Court's Order Striking Certain Affidavits provided by Plaintiff.

**3.   Brief Statement**

**By Plaintiff:** Plaintiff, Amber Hall ("Hall" hereinafter) brings before this Honorable Court five (5) claims related to her wrongful termination from Defendant Gestamp of West Virginia, LLC ("Gestamp" hereinafter): 1) violation of the <u>West Virginia Human Rights Act</u> ("WVHRA" hereinafter) – <u>disability discrimination</u> resulting in retaliatory discharge / wrongful termination; 2) violation of the <u>WVHRA – failure to accommodate</u> disability resulting in retaliatory discharge / wrongful termination; 3) violation of the <u>WVHRA – gender/sex discrimination</u> resulting in discriminatory discharge / wrongful discharge; 4) interference with Hall's rights pursuant to The Family and Medical Leave Act of 1993, 29 U.S.C.A. §§ 2611 through 2617 ("FMLA" hereinafter); and, 5) FMLA retaliation resulting in retaliatory discharge / wrongful discharge.  See, Memorandum and Order, Docket Entry No. 44, Entered August 27, 2020 (herein).

**Brief Statement By Defendants and Discussion of Contested Theories of Liability:**

1.      To establish a *prima facie* disability discrimination claim, Plaintiff bears the burden of showing (1) she meets the definition of disabled; (2) she is a qualified individual; and (3) a causal link between her alleged disability and her termination that raises an inference of discrimination.  *Powers v. Covestro LLC*, 2017 WL 1952230, at *4 (S.D.W. Va. May 10, 2017); *Daniel v. Raleigh General Hospital, LLC*, 2018 WL 3650248, at *7 (S.D.W. Va. Aug. 1, 2018).  Plaintiff cannot show that she had a disability under the West Virginia Human Rights Act  Plaintiff cannot show that Defendants had actual knowledge of her disability..  Furthermore, she has no evidence that her medical condition caused her termination.  Finally, she has no evidence that Gestamp's reason for her termination, that she violated its Zero-Tolerance Sex Harassment policy, is pretextual.  Plaintiff did not request an accommodation due to her medical condition during her employment.  *See Powers*, 2017 WL 1952230, at *6.  Even if Defendants had relied on a known disability in terminating Plaintiff's employment, Defendants nonetheless prevail because Plaintiff failed to prove that but for a known disability her employment would not have been terminated.

Plaintiff never sought accommodation for any essential functions that any actual or recorded disability-based restrictions foreclosed her from performing, and Defendants anyhow were unaware of any such restrictions or such need.

2.      To demonstrate a *prima facie* case of gender discrimination under the WVHRA, W. Va. Code Sec. 5-11-1, et seq. (1979), Plaintiff must prove: (1) she is a member of a protected class; (2) the employer took an adverse decision concerning the plaintiff; and (3) but for Plaintiff's protected status, the adverse decision would not have

occurred. *Conaway v. Eastern Associated Coal Corp.*, 178 W. Va. 164, 358 S. E. 2d 423 (1986).   To establish causation, Plaintiff must "show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion." *Tom's Convenient Food Mart*, 527 S.E.2d at 158 (quoting *Conaway v. Eastern Associated Coal Corp.*, 358 S.E.2d 423, 4429-430 (W.Va. 1986)).   Plaintiff's gender discrimination claim fails because she has no evidence that her gender caused her termination or that male employees who were similarly situated were treated more favorably.   Furthermore, she cannot demonstrate that Gestamp's reason for her termination was pretextual.   Even if Defendants had relied on Plaintiff's gender in terminating Plaintiff's employment, Defendants nonetheless prevail because Plaintiff failed to prove that but for her gender her employment would not have been terminated.

3.     Plaintiff cannot prove FMLA interference, which requires that she "demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA," **and** that she "has been prejudiced by the violation in some way."   Plaintiff must show that (1) she was an eligible employee, (2) Gestamp was an FMLA-defined employer, (3) she was entitled to leave under the statute, (4) she gave notice to the employer that she would take FMLA leave, and (5) Gestamp denied her FMLA rights. *Trail v. Util. Trailer Mfg. Co.*, 2020 WL 104681, at *5 (W.D. Va. Jan. 8, 2020). Prejudice requires a showing of some monetary loss or "some loss in employment status remediable through 'appropriate' equitable relief, such as employment, reinstatement, or promotion." *See Ranade v. BT Americas, Inc.*, 581 F. App'x 182, 184 (4th Cir. 2014).   Plaintiff cannot establish that she was denied leave under the FMLA or that she was prejudiced by the denial of leave.

4.     Plaintiff must prove the following elements to establish a retaliation claim under the Family and Medical Leave Act: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment decision; and (3) there exists causal connection between the protected activity and the adverse employment action.  *See Fry v. Rand Constr. Corp.,* 964 F.3d 239, 245 (4th Cir. 2020).  Plaintiff has no evidence that her taking Family and Medical leave caused her termination.  She cannot establish that Gestamp's legitimate reason for her termination was pretextual.

5.     Plaintiff has not properly made out a *prima facie* case for punitive damages. *Michael on Behalf of Estate of Michael W. Sabado*, 192 W. Va. 585, 453 S.E.2d 419 (1994); *Heldreth v. Marrs*, 188 W. Va. 481; 424 S.E.2d 157 (1992).  She is unable to prove any set of facts that would justify the imposition of punitive damages under the West Virginia Human Rights Act.  Defendants did not act willfully or maliciously, or with reckless indifference, and therefore, an award of punitive damages is not appropriate. Gestamp discharged Plaintiff based on her violation of Gestamp's Zero-Tolerance Sex Harassment policy.  *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 548 (1999).  Plaintiff is not entitled to punitive damages because such damages violate the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the Constitution of the United States.

6.     Plaintiff has failed to mitigate her damages, and therefore, her right to recovery should be barred or reduced accordingly.  *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 296-97 (2002).  Plaintiff cannot establish that Defendants acted willfully under the Family and Medical Leave Act.  Plaintiff is not entitled to liquidated damages under the Family and Medical Leave Act because Gestamp acted in good faith.  Plaintiff's FMLA claims against the individual defendants are due to be dismissed because they were not

her "employer" under the FMLA.   Unclean hands forecloses reinstatement or other injunctive relief.  Plaintiff is not entitled to compensatory damages because any emotional distress or mental anguish she may have suffered was caused by occurrences other than for which Defendants are liable as a matter of law.

4.    Plaintiffs: <u>FACTUAL STATEMENT RELATED TO PLAINTIFF'S CLAIMS</u>

Hall was employed at Gestamp West Virginia, LLC (hereinafter "Gestamp") in South Charleston, West Virginia from February 2014 to April 25, 2017.  Barry Holstein, Kenneth Suprenant and Scott Hughes were all employees of Gestamp.  Barry Holstein ("Holstein" hereinafter) was for some time Hall's direct supervisor.  Thereafter, Kenneth Suprenant ("Suprenant" hereinafter) was Hall's supervisor.  And, at all times relevant to Hall's complaints, Scott Hughes ("Hughes" hereinafter) was the Human Resources manager at Gestamp.

Hall was an employee on the rise at Gestamp until she experienced medical setbacks resulting in required FMLA leave. She applied for Gestamp via contract employer Adecco.  Hall interviewed with Gestamp employees Ken Huebner and Valerie Somerville and was hired for the job in the "Lasers" department with Ken Huebner serving as her supervisor.   Eight months after working as a temporary employee Amber was promoted to a Gestamp full time employee as a production associate starting in August 2014 at $12/hour.  Hall moved up to a Team Leader Position and her pay increased nearly 25% to $15/hour within six months of employment. Hall moved up so fast to the management position other employees were upset. Particularly, Chris Groom and Rhonda Holbert were upset about Hall's quick climb to a Team Leader Position at Gestamp.

Hall was promoted again on October 10, 2015 to a supervisor position earing $62,000.00/year.  And was receiving great reviews.  In February 2016 Hall received another advancement, this time a merit increase from $62,000/year to $65,000/year.

 Hall advanced her path again with Gestamp, this time being promoted from supervisor to group leader.  This is about the time she was managed by Barry Holstein ("Holstein" sometimes hereinafter).  This is the start of the problems with Hall's Employment.  It was little things at first, like the fact that Hall was supposed to complete leadership training, but she was not permitted to take the course as Holstein put Steven Thomas in the program in place of Hall.  Barry Holstein failed to review Hall's responsibilities has a supervisor with her, causing Scott Hughes to have to review the responsibilities with Hall several months later.

 In this new position, Hall's hours did increase.  However, she was assigned more hours than anyone else; she would work from three a.m. until seven p.m., eight p.m., nine p.m., ten p.m., and even up till two a.m. the next day (nearly a 24 hour shift). While Barry Holstein, her boss, normally only worked six a.m. to five p.m.

 Holstein has issues with Hall's relationship with Honda employee, Korey Blimke.   . Holstein apparently made up a story that Hall "flipped off" a Honda employee and reported the same to Human Resources.  Later, the complaint against Hall was changed to a "jack-off" gesture.  Later it was determined that Holstein complained of the unfounded "flipping off" and "jack-off" gesture alleged to have been made by Hall because Holstein was mad at Hall for Hall rejecting Holsteins attempt to get Hall to go on a date with her. Holstein then became more involved in Hall's relationships, told her that she needed to dress different from men who had the same job, that Hall should do her hair and apply makeup.

16

Holstein then started unilaterally changing Hall's start time from 6:30 am to as early as 2:30 am, this became a near daily occurrence. The issues with Holstein caused Hall anxiety and exhaustion, it got to the point where Plant Manager Paul Lezanic told Hall he was worried about her mental health.  Paul Lezanic noted that while Hall is good at her job, maybe it was not for her.

 Holstein then tried to retaliate against Hall, falsely claiming that Hall was had 18 absences.  Holstein was basing her alleged absences on "Card Swipes". It was customary for employees to walk in at the same time as other employees, it was a common practice as cards where not always swiped and management, such as Hall, did not really need to swipe in because they worked so many hours. In fact, Amber Hall was the only employee that was questioned about swipes as all other Group Leaders, mainly male, didn't have to be at the plant until 6:45 a.m. while Hall was required to be earlier, and work longer. When Amber Hall finally had enough, she complained to corporate HR manager Will Smith who called Hall's concerns "disturbing" suggesting she deal with now Plant Manager Walter Thomas.   The conditions got worse leading to Hall telling Gestamp HR (and Plant Manager Lezanic) about her declining health: throwing up, migraines, exhaustion, body aches, earaches, diarrhea, night sweats, and anxiety.

 Hall did get to meet with Walter Thomas.  Hall discussed the unfair treatment, the harassing that she was receiving for dating Korey Blimke, and explained to Walter Thomas how the constant change of schedule, the constant calls to her at home, the constant threats over her appearance (make-up, hair, blouses) were affecting her physical health.  Holstein continued to make it hard for Hall, again treating her different based on her gender: staring at her in a sexual manner, indicating she didn't need gum

because Holstein did not want to kiss Hall, forcing Hall to be dressed up with makeup, nice hair, etc., not allowing Hall to talk to men for more than ten minutes, made efforts to keep Hall way from male co-workers, knowing intimate details of Hall's personal life like where she was going, who she was with, where she went, etc.  Holstein had photos taken of Amber Hall.  None of these demands were made of male employees, not of this stalking was completed on male employees. Hall's complaints were not taken seriously at all.

On December 3, 2016, Hall had an anxiety attack at work and was taken out of the Gestamp facility in an ambulance.  Hall's physician placed her on FMLA from December 4 to December 17, 2016, in order to get treatment for her acute anxiety stemming from her PTSD.  Hall continued to receive medical treatment for anxiety from her PTSD after she returned from FMLA.

Hall suffered another anxiety attack at work on January 17, 2017. Hall was again placed on FMLA leave from January 17 until March 19, 2017. She continued to receive treatment and therapy for her PTSD anxiety during this time. Hall had a known medical condition of anxiety and PTSD diagnosed by Dr. Bernie Grose.   She received counseling from Sarah Smith. The treatment, and lack of concern over Hall's complaints, resulted in Hall being transported out of Gestamp on ambulance on two occasion suffering from acute anxiety. These work incidents leading to the acute anxiety forced Hall on FMLA leave (twice).  Hall first took off two weeks on FMLA leave and returned to work around December 16, 2016, Gestamp was aware of the medical condition and reason for FMLA (Gestamp processed Hall's FMLA application).   Upon return Hall wanted to use some earned vacation, which was rejected by Holstein stating that Hall had to do evaluations, so Hall was forced to come in over her vacation to work; and did.

Hall informed Scott Hughes ("Hughes" hereinafter) that she was going to be off work for medical issues.   Hughes asked if Hall was doing well and told Hall to stay in contact. Hughes received Hall's FMLA papers and knew that she was out for medical reasons. Hughes received a Feb. 15, 2017 letter from Sarah J. Smith, MA LCP indicating that Hall was still in treatment.  Hall even had communicated with Hughes via test message that Hall did in fact bring in her FMLA paperwork and wanted to ensure Hughes received the same.

Abruptly Hughes contacted Hall to incorrectly inform her that her FMLA was up.   Hughes told Hall he sent her a certified letter (which she did not get). This caused Hall to have to rush to her doctor to get medically cleared to return to work on March 17, 2017, when she, in fact, had more FMLA to use (*infra.*) and only on a day or so warning.  Hall, confused, reminded Hughes that Hughes had informed Hall she had three months of FMLA leave but had only used two months.  Regardless, Hall was forced to get a return to work authorization to prevent from being terminated from her job.

In Hugues letter to Hall he incorrectly demands she return to work on March 17, 2017 or her position will be filled by someone else. This letter, worded more like a termination letter as it sets out COBRA benefits and other benefits common with termination, states that Hall must return to work or face termination.  Hughes based his calculation on an incorrect calculation on Hall's FMLA leave, using a 40 hour a week "formula" not an average hour a week that Hall actually worked formula.  Hughes had miscalculated Hall's FMLA[1].  Thus, while it was suggested in the March 9, 2017 that Hughes did not expect Hall to return, she was forced to get her medical provider to allow her to return on March

---

[1] Hughes used a "40 hour" formula to calculate Hall's FMLA time when the formula should have been based on Hall's average weekly hours work to get a correct 12 week calculation.

17, 2017 or face certain termination. Hall was told she could not use intermittent medical leave.  Thus; Hall was denied an accommodation as it was clear that her physician had stated in the FMLA documentation that Hall would experience flare ups and it would be medically necessary for Hall to be absent from work during the flare-ups.

While Hall was out on her second FMLA leave things changed at Gestamp:

    a.  Aaron Lambert filled in form Hall as group leader;

    b.  Hall was informed that Kenneth Suprenant had recited Aaron Lambert for the position; and,

    c.  Aaron Lamber had assumed Hall's role and took her desk.

More changes were apparently after Hall returned from her second FMLA leave on March 19, 2017:

    a.  First, Hall was told nothing had changed;

    b.  Hall had no control over her team, Aaron Lambert assumed control;

    c.  Aaron Lambert was directing Hall's team over the radio;

    d.  Hall wasn't allowed into meetings she was normally allowed;

    e.  Aaron Lambert began giving Amber Hall directions;

    f.  The higher-level management team wouldn't communicate with Hall and directed her actions though Lambert;

    g.  Lambert was directed to watch Hall, and check in on her;

    h.  Lambert was reporting Hall's every move to upper management;

    i.  Hall was continuing to be ignored by upper management and only got direction from Lambert;

j. Lambert as close with upper management in Rusty Mossberger, Walter Thomas and Kenneth Suprenant and group were out drinking together often;

k. Hall was questioned about projects she wasn't permitted to work on; and,

l. Generally not made part of the day to day work environment like was prior to leave.

Then, suddenly, about a month after returning from disability/FMLA leave, Hall was terminated. Reason? She said, "maybe one day I'll have a butt like yours". . And was terminated for violation a sexual harassment policy that was rarely, if ever, enforced. The reason for termination was pretextual.

Hall was terminated for saying "Maybe one day I'll have a butt like yours". The comment was directed towards Erica Haynes ("Erica" hereinafter) who laughed it off and, "popped her butt out", rubbed her butt then said "I know it's nice. I ride horse to keep in shape." Erica then said to Hall "but if I had boobs like yours, I would have it made." This was a lighthearted conversation that Erica did not even report to Human Resources. What happened was Erica got upset when Hall denied her vacation pay (Hall explains why she could not approve Erica's vacation – it would have been in violation of the 10% out policy). Even Erica stated that she though Hall had an issue with her because Hall denied her vacation. In fact, the statement was not even drafted by Erica. Instead, Scott Hughes took the statement on April 21, 2017, wrote if for Erica, and had Erica sign it on May 11, 2017 – about three weeks later. Scott Hughes the drafted up another statement for Erica 3 days later, on April 24, 2017 for her to sign (again, three weeks later on May 11, 2017). During litigation, Gestamp drew up a third statement for Erica to sign, this time called Affidavit of Erica Haynes – here Erica admits that she did not go to HR on the "butt"

comment, but Kenneth Suprenant talked Erica into going to HR to file the complaint against Amber.

On April 25, 2017 Hughes terminated Hall for saying "maybe one day I'll have a butt like yours". Notably absent from this meeting was Kristina Dodd, a female who worked in the Human Resources office who Amber Requested to be in the room. Notably present in the room where termination was decided was Russell Mossberger and Kenneth Suprenant who had no firsthand knowledge of the incident.

Hall had wanted Kristian Dodd ("Dodd" hereinafter) to be in the meeting because Hall knew Dodd got all the facts. Hall had recorded an exchange of the parties. The transcript reveals as follows:

a. First it was clear that Erica's main complaint was about the denied vacation, not the "butt" comment.

b. Hall explained that she was "over 10" meaning she could not approve another person on her team for a day off because it would place Hall's team with 10% or more of its member out of work which would have been a policy violation; and,

c. However, Hall also explained that Erica can have her denial overridden by Suprenant – which was policy – and Erica did get her vacation day.

Even Hughes agreed that Hall could not have allowed Erica to take the vacation day without further approval. Yet, used a "sexual harassment policy that was rarely followed to terminate an employee hardly a month off disability leave. Gestamp took major issue with Hall saying a "Maybe one day I'll have a butt like yours" but not with countless other sexual harassment claims. The following are just a few examples of the sexual

harassment claims Gestamp didn't find offensive enough for actions:

a. Rhonda Holbert complained being sexually harassed by Bill Hardman, Bill Hardman was not terminated, he was only moved to a different location of the plant.  Ex. 1, *Hall Depo T.R. Vol. I*, at pages 71-72;

b. The same Bill Hardman that Hall complained about when Bill Hardman told Hall he liked when Hall sneezed because it made he nipples get hard, and made comments about how Bill Hardman would like to bend Amber over and have sex with her.  Ex. 1, *Hall Depo T.R. Vol. I*, at pages 71-72';

c. Likewise, Mark Chandler was making Hall feel uncomfortable by sending her notes, following Hall around the plant without reason and as suspected to be the person that broke into Hall's home.  Ex. 1, *Hall Depo T.R. Vol. I*, at pages 73-74.   Mark Chandler was not terminated for his actions leading to Hall's complaint.  Ex. 1, *Hall Depo T.R. Vol. I*, at page 74.  Despite Hall providing proof of the creepy letters.  *See*, Ex. 3, Letters wrote to Hall by Chandler;

d. Hall had previously filed a complaint of sexual harassment against Barry Holstein. Holstein was plaintiff's supervisor.  Holstein made request to Hall for dinner and made inappropriate comments about her sex life leading Hall to file a complaint on Mr. Holstein. Holstein asked Hall out for drinks and dinner, over which he said they could discuss her future opportunities at the plant. Hall declined this invitation. Holstein was not disciplined for his actions. Ex. 30, Page 1, Paragraph 11.

e. Gestamp has a history of lover looking sexual harassment complaints when women complaint about sexual harassment In Shawn Waters Affidavit, Ms. Waters identifies the following incidents:

   i. Antione Anderson (male) propositioned Sara Cook (female) for sexual relations while Sara Cook was a subordinate to Antione Anderson;

   ii. Kelly Carroll reported the Anderson/Cook sexual relationship to Scott Hughes;

   iii. Antione Anderson didn't face any discipline or investigation;

   iv. Antione Anderson constantly propositioned female workers for sexual favors to which was common knowledge;

   v. Antione Anderson asked me [Shawn Waters, female], on a weekly basis, when I'm going "black". Suggesting that I have sex with a black man - Antione Anderson is a black man;

   vi. Women that did sleep with Antione Anderson got promoted such Sara Cook, and Erica Haynes. I have personal knowledge that Erica Haynes did sleep with Antione Anderson. Antione Anderson was a superior to Erica Haynes;

   vii. Erica Haynes also had sexual relationships with Joel Jones, and Aaron Lambert [Joel Jones and Aaron Lamber were also Gestamp employees];

   viii. Antione Anderson recruited a female named Leann Hemingway from 3rd shift Lasers department, to first shift quality. Antione

24

Anderson was having a sexual relationship with Leann Hemingway and allowed her to come in to work when she wanted, Antione Anderson also adjusted Leann Hemingway's time on her clock in to show that she would appear on time when she was not.  Antione Anderson would sexually rub on her shoulders during working hours in front of the whole department;

ix.  I have personal knowledge that Bill Hardman was charged with sexual harassment while employed at Gestamp, namely Rhonda Holbert.  Bill Hardman was not fired for the sexual harassment and was permitted to keep his job. I know personally this was also reported to Human Resources.

x.  I [Shaun Waters] was personally sexually harassed by Ken Brooks.  That harassment was reported to Scott Hughes.  Hughes didn't terminate Ken Brooks.  I personally know that this was Ken Brooks' third complaint for sexual harassment at Gestamp.  The first being a female name Haley (last name escapes me) (Haley was "air humped" by Ken Brooks), and a second female, then myself.  Ken Brooks is still working a Gestamp and is close with Antione Anderson;

xi.  Many supervisors at Gestamp knew about my complaints as to the sexual harassment forced upon me by Ken Brooks including David Underwood, Jimmy Rolland, Sandra King, Antione Anderson, Scott Hughes, and John Fields;

xii. The sexual harassment Ms. Waters experienced by Ken Brooks was reported to Human Resources prior her evaluation. She had always got 4-5s on her evaluations.  She was provided 2-3s on her evaluations after the sexual harassment was reported;

xiii. I [Shaun Waters] have personal knowledge of Antione Anderson "dirty dancing" with subordinate female employees and purchasing drinks for them a Christmas Party 2018 in front of the whole company, including Scott Hughes.  Antione Anderson was not disciplined; and,

xiv. Antione Anderson also told me [Shaun Waters] personally to get Kelly Carroll to go out on a date with him.  Kelly Carroll declined several times.  Then Antione Anderson told me personally that he only needed "20 minutes" with Kelly Carroll implying that he just wanted to have sex with her.  *See*, <u>Affidavit of Shaun Walters</u>, filed herein, Docket Entry No.: 83 (11/20/2020) (Ex. 26 herein).

b. Shondell Houston, in her affidavit, also identify known sexual harassment claims reported to HR wherein no action was taken:

i. Corey Myrick was in a sexual relationship with a subordinate female named Stacy Eyler who worked in quality control.  Corey Myrick openly talked about the sexual relationship and I know for a fact that Scott Hughes knew about the relationship.  I personally reported [to HR] that Corey Myrick was in a sexual relationship with a subordinate (Stacy Eyler), and Corey Myrick became

26

intoxicated and assaulted her, and strangulated her outside work and was arrested.  I told Scott Hughes about the improper sexual relationship and about the attack.   Scott Hughes did nothing about the incident.  Scott Hughes allowed Corey Myrick to come back to work;

ii.   Kip Wiseman, plant manager, was having a sexual relationship with a female subordinate as well, Carla Donahue.  I told Kip Wiseman that I didn't want the girl he was having sex with/living with (Carla Donahue) on my floor because she knew nothing about quality at all.  Kip Wiseman wanted to give her a job because he was having sex with her and living with her.  I personally asked Scott Hughes about the inappropriate relationship between Kip Wiseman, plant manager, and subordinate Carla Donahue having an open sexual relationship, and living together, Scott Hughes just smiled at me, and walked on by.  Nothing was done by Scott Hughes or Gestamp about the relationship that per the handbook was improper as Carla Donahue was a subordinate to Kip Wiseman;

iii.   All my [Houston's] complaints to Human Resources fell on deaf ears.  Scott Hughes never took any complaint wherein a female was complaining about sexual harassment issue from a man serious, unless he wanted to; and, in my experiences, and to my personal knowledge and observations, neither Gestamp, nor

Hughes took disability concerns of female employees serious, or FMLA request from female employees serious.  Gestamp and Hughes demonstrated a pattern of overlooking sexual harassment complaints when they didn't want to get rid of the person that was accused, and demonstrated a pattern of demoting or terminating employees that took time off for disability leave or FMLA leave.  I experienced this personal as stated above;

iv.  Gestamp let Antoine Anderson get away with sexual harassment on an almost daily basis.  There were complaints about Antoine Anderson sexual harassment all the time. I personally know that sexual harassment complaints were filed upon Antione Anderson on numerous occasions and Scott Hugues ignored them all.  I personal witnessed Antione Anderson harass Darlene Perry.  I personally went with Ms. Perry to complaint to Scott Hughes about Darlene Perry being sexually harassed by Antione Anderson, nothing was done, no investigation was completed.  So, I was actually in front of Scott Hughes with Ms. Perry explaining the sexual harassments and how it was affecting Ms. Perry and nothing was done to Antione Anderson.  Antione Anderson was making sexual comments to Ms. Perry and attempting to get her to engage in sexual acts in which she rejected – this was told to Hughes in my presence by myself and

Ms. Perry. Antione Anderson's actions toward Ms. Perry were not welcome and did affect her and caused her anxiety and distress. I know that because Ms. Perry told me the same personally;

v. I [Houston] personally also know that Sara Cook (female), Gestamp employee, also was in a sexual relationship with Antione Anderson. Antione Anderson approached her with sexual comments and requested sexual favors. I do also know for a fact personally that Sara Cook did engage in sexual actions including intercourse with Antione Anderson. I personality reported to Scott Hughes Antione Anderson was sleeping with Sara Cook, nothing was done;

vi. Antione Anderson also harassed Lisa Stoner. Lisa Stoner complained about Antione Anderson sexual harassment to Scott Hugues. I was there when Lisa Stoner complained about Antione Anderson Sexual Harassment to Scott Hugues. Nothing was done. No complaints, no investigation, and Antione Anderson still didn't get written up or fired;

vii. At a time, prior to January 1, 2019 HR consisted of Scott Hughes (Head of HR), Katrine Kessler (HR Generalist/Assistant to Hughes), and Heather Dornife (HR Generalist). Erin Lambert, a male (Hourly Employee) and subordinate to Heather Dornife were involved in an open sexual relationship that HR/Hughes

know about. Since Heather Dornife was in HR, it is my understanding that she couldn't date/be in a sexual relationship with an hourly employee. But I personally know she was and that Hugues know about the relationship;

viii. I [Houston] have personal knowledge, and personally observed the following: on one shift, in the afternoon, after lunch, around 1:20 PM – 1:45PM, while I was looking for one of my engineers, I saw Carla Donahue (female) sitting on the lab (sic) of a manager named Bill (I cannot recall his last name). Carla Donahue was an hourly employee and Bill was a manager/supervisor so a superior to Carla Donahue. I told Carla Donahue to get off his lap because the action was completely inappropriate. Both Donahue and Bill laughed at me. I personally reported the inappropriate actions to Scott Hughes; Hughes did nothing about the actions which were deemed inappropriate according to the Gestamp Handbook. *See*, Affidavit of Shondell Houston, filed herein, Docket Entry No.: 84 (11/20/2020) (Ex. 27 herein).

c. Mike Borrows likewise identified sexual harassment where no action was taken:

i. I [Borrows] have firsthand knowledge that Antione Anderson propositioned Sara Cook for sexual relations while Sara Cook was a subordinate to Antione Anderson, Kelly Carroll reported the

relationship to Scott Hughes.  Antione Anderson didn't face any discipline or investigation;

ii. Antione Anderson constantly propositioned female workers for sexual favors to which was common knowledge;

iii. Antione Anderson has sex with Sara Cook in the plant during working hours;

iv. Kenneth Suprenant knew about Antione Anderson's reputation of soliciting employees for sexual relations at work;

v. Kenneth Suprenant was very close with Antione Anderson. The pair were out after work at restaurants and bars all the time.  I used to go to out drinking with Kenneth Suprenant and Antione Anderson.  Antione Anderson would talk about the women he slept with at Gestamp.  Kenneth Suprenant knew about Antione Anderson sleeping with subordinates at Gestamp including Sara Cook.  Kenneth Suprenant never reported Antione Anderson;

vi. Thomas Smith was reported to Human Resources for sexual advances on Kelly Carroll.  Both Thomas Smith and Kelly Carroll were Gestamp employees.   Scott Hughes didn't discipline Thomas Smith.

vii. On at least one occasion, I [Borrows] was drinking with Kenneth Suprenant and Antione Anderson after work.  Antione Anderson began inviting subordinates to the bar to come drink with us.  No one thought this was an issue.

viii. I have personal knowledge of Antione Anderson "dirty dancing" with subordinate female employees and purchasing drinks for them a Christmas Party 2018 in front of the whole company, including Scott Hughes. Antione Anderson was not disciplined.

ix. Sexual harassment was common at Gestamp. Literally everyday there was sexually suggestive comments made. Too many to even recall. The whole culture was just sexually suggestive. Comments were made all the time of sexual nature. Everyone, including Human Resources was very aware of the sexually suggestive culture at Gestamp. *See*, <u>Affidavit of Mike Borrows</u>, filed herein, Docket Entry Nos.: 85 and 87 (11/20/2020 and 11/23/2020) (Ex.29, herein).

d. Diana D. Williams filed a complaint against Gestamp stating as follows:

i. During my employment with Gestamp, I was repeatedly exposed to sexual harassment by Mr. Beckner, my superior at Gestamp, including unwelcomed touching and disgusting verbal comments made to her with sexual connotations;

ii. I [Williams] complained of the same; however, those complaints fell on the deaf ears of Scott Hughes, Human Resources Manager, and no investigation was conducted with regard to my sexual harassment complaints.

iii. Instead, after I complained about the unwelcomed advances, touching and disgusting sexual comments made by Mr Beckner

32

to me, Scott Hughes and Gestamp took retaliatory action against me and began to levy unwarranted discipline upon me;

iv.   Neither Gestamp, nor Scott Hughes took my sexual harassment claims serious, and didn't investigate my claims;

v.   At all times during my employment with Defendant Gestamp, there existed an atmosphere and culture at Defendant Gestamp where female employees were treated differently than male employees in all areas, including pay, promotions, harassment and discipline.   Men often were not disciplined for sexual harassment;

vi.   In spite of my complaints, Gestamp and Hughes failed to take any disciplinary action against Mr. Beckner for his improper touching and sexual comments made by him towards me. See, Ex. 29.

e.   Maura Workman identifies sexual harassment issues at Gestamp as well:

i.   [Workman] went to Scott Hughes (Human Resources), and Kristina Dodd concerning my complaints about being sexually harassed, and complaints about harassment from Carolyn Starcher and Amanda Koehl. I had written statements that I took to Scott Hughes from several people and ignored, not investigated, and not changes were made;

ii. Gestamp West Virginia, LLC maintained an atmosphere of sexually suggestive conduct. Sexual comments were made literally all day everyday;

iii. Lots of men at Gestamp had sexual relationships with women they managed;

iv. Rhonda Holbert showed me pictures of men's penis such as Barry Holstein and Rusty Mossburger. Rhonda Holbert dated and had a sexual relationship with Keith Lemon who was her supervisor, everyone knew about their relationship;

v. Rhonda Holbert had a sexual relationship with Marv Bush who was also a supervisor. There are many other examples of men sleeping with women in subordinate positions at Gestamp that escape my memory. However, it was very common and always overlooked;

vi. Gestamp simply wanted Amber Hall gone after she went off on leave for the first time. There were comments all over the Plant that Amber Hall was not going to come back after she left. These were made by Carolyn Starcher and even Scott Hughes. *See*, Affidavit of Maura Workman, filed herein, Docket Entry No.: 78 (11/11/2020) (Ex. 32, herein).

f. Kelly Carroll-Burrows has similar details:

a. I was harassed by Kenneth Brunner. I complained to Kenneth Suprenant about the harassment from Brunner. Suprenant never

complained to HR about Brunner's harassment of me.  Suprenant told
me he was going to talk to someone about Brunner's treatment of me.
But nothing ever happened until months after several complaints were
made. This is a direct contradiction to Gestamp following their zero-
tolerance sexual harassment policy;

b.  Gestamp has a reputation of not disciplining men for sexually
harassing women.  Personally, I know that Dan Stacy made a sexual
comment and gesture that I only got promoted to Team Leader
because I was under Ken Huber's desk preforming oral sex on Ken
Huebner.  Dan Stacy then made a sexual gesture mimicking oral sex.
I reported Dan Stacy to HR.  Scott Hughes was in the HR office at that
time I made the report.  Nothing happened to Dan Stacy that I was
aware of, he appeared at work the next day.  Dan Stacy wasn't
terminated.  *See*, Affidavit of Kelly Carroll-Burrows, filed herein, Docket
Entry No.: 87 (12/02/2020) (Ex. 32, herein).

**Defendants – Brief Summary of Material Facts**:

After Hall was promoted to Supervisor/Group Leader in the Fall of 2015, in 2016,
Gestamp began having significant issues with Hall's performance and attendance,
including time management and completing projects on time, attendance,
professionalism, consistent policy application, following the schedule and policy instead
of her own decisions, and attention to the task at hand rather than spending time in other

areas of the plant.  Additionally, she was involved in an intimate relationship with a customer representative, which management believed caused a conflict of interest. As a result, management met with Hall to improve her performance and attendance issues, and ultimately, her Manager Barry Holstein issued her an attendance warning and told her that further performance issues would result in disciplinary action.  Directly thereafter, Hall complained to Thomas and Hughes about Holstein's treatment of her and others. Hall drafted three written complaints totaling 11 pages and 463 single-spaced lines, complaining about Holstein, but not making sex harassment allegations. Hughes investigated Hall's complaint, interviewing Hall, Holstein, and at least nine other witnesses, none of whom corroborated Hall's allegations.

After Hall was taken out of Gestamp by an ambulance two times in December 2016 and January 2017, two FMLA leaves of absence were approved for Hall and she was out on FMLA leave for a total of eleven full weeks and four additional work days.  On March 15, 2017, Hall called Hughes notifying him she was going to be released to return to work, and he asked her if she had received the certified letter he had sent notifying her of the expiration of her leave, which she admits she did not pick up from the post office.  She was not denied any leave she sought, each day she missed was covered as FMLA on Gestamp's FMLA tracker, and she was not penalized for any days she missed. Consistent with Gestamp's practices, Team Leader Aaron Lambert was asked to step up into the Group Leader role while she was out, was asked to transition her to new practices after she returned from leave, and was moved out of her area within two weeks after her return from leave. Hall returned from leave with her same position, pay, and responsibilities.

Gestamp's Standards of Conduct contain a "Zero Tolerance" policy stating that violations of Gestamp's No Harassment/Discrimination policy "generally will result in immediate termination."   As HR Manager, every employee Hughes has determined violated the Zero Tolerance sex harassment policy has been terminated, including three male employees, one a Group Leader, and one, in May 2017, shortly after Hall's termination. On April 21, 2017, Erica Haynes complained to her Supervisor, Suprenant, and then to Hughes, that she was very bothered by an incident when Hall had told her Haynes had a nice butt and Hall wished she had a butt like Haynes's, while Hall was stroking her hair, when Haynes had previously asked her not to stroke her hair. Hughes, Mossberger, and Suprenant investigated Haynes's complaint by interviewing Hall, witnesses Groom and Holbert, as well as Haynes a second time. No one corroborated Hall's account that Haynes had been joking and had made a comment about Hall's breasts. As a result, Hughes and Mossberger decided that Hall's employment should be terminated for violating the Zero Tolerance sex harassment policy.

**5.    A single listing of the contested issues of fact and the contested issues of law.**

**Plaintiff:**

1. Plaintiff states there are clear issues of fact as to the pretextual reason behind her termination. As stated in Plaintiff's Brief Statement issues include: FMLA retaliatory discharge has she was terminated about a month after returning from FMLA leave, FMLA violations wherein Plaintiff was not provided a correct accounting of her FMLA leave (Hughes used a 40 hour formula, not an "average hours per week worked" calculation as required, whether Plaintiff

was discriminated against based on disability as she was terminated a month after returning from leave due to a known disability, and/or whether Plaintiff was discriminated against based on sex as she was one of few women in her position, and claims that men get preferable treatment when it comes to treatment at Gestamp predominantly when it comes to a deciding factor concerning violation of the sexual harassment policy.

**Defendants:**

1.      Defendants do not believe there are any contested issues of fact that arise to material issues of fact that preclude the Court from granting Defendants' Motion for Summary Judgment.

2.      Whether Defendants are entitled to summary judgment in that there are no genuine issues of material fact regarding the necessary elements of Plaintiff's claims.

3.      At the time of Plaintiff's termination of employment, was she substantially limited in the performance of a major life activity under the Americans with Disabilities Act?

4.      Was Plaintiff's employment terminated because of an actual or perceived medical impairment that substantially limited a major life activity?

5.      Has Plaintiff shown that she would not have been terminated if she had not had a medical impairment which substantially limited a major life activity?

6.      Has Plaintiff proved by a preponderance of the evidence that her gender was a substantial or motiving factor that prompted Gestamp to terminate her employment?

7.    Would Gestamp have terminated Plaintiff's employment even if it had not considered her gender?

8.    Did Gestamp deny Plaintiff any rights under the FMLA?

9.    Was Plaintiff prejudiced by Gestamp's denial of rights under the FMLA?

10.   Was Plaintiff's FMLA leave a substantial and motivating factor in her termination?

11.   Has Plaintiff established that she would not have been terminated if she had not taken FMLA leave?

12.   If Gestamp violated the FMLA, was its violation willful?

13.   Did Gestamp act in good faith under the FMLA?

14.   Has Plaintiff established that she suffered damages due to the disability and gender discrimination?

14.   Did Plaintiff make a reasonable effort to mitigate her damages?

15.   Can Plaintiff establish a case for punitive damages under the West Virginia Human Rights Act?

**6.    Stipulations**

a.   Gestamp West Virginia, LLC ("Gestamp"), operates a just-in-time auto parts manufacturing facility in South Charleston, West Virginia.

b.   At all relevant times, Gestamp has been a corporation with more than 75 employees;

c.   Plaintiff Amber Hall was hired to work at Gestamp through a staffing company, Adecco, and began her Adecco employment in February 2014;

d.   Plaintiff was hired as a Gestamp employee in August 2014;

e. When she began her Gestamp employment, Plaintiff received a copy of the Gestamp employee handbook, which she understood applied to her;

f. On April 25, 2017, Plaintiff was terminated by Defendant for a violation of the Defendant's Zero-Tolerance Sexual Harassment Policy;

g. Plaintiff did apply for and receive leave pursuant to the Family Medical Leave Act while employed by Defendant;

h. Plaintiff did return to work after talking FMLA leave, on two occasions.

**7.    Suggestions to avoid unnecessary proof or cumulative evidence.**

None.

**8.    Suggestions concerning any need for adopting special procedures for managing potentially difficult or protracted aspects of the trial that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems.**

Defendants and Plaintiff plan to file a proposed Special Verdict form with their proposed Jury Instructions.

**9.    A list of special voir dire questions, if any, that counsel request to be asked of the jury panel.**

**Plaintiff:**

1. Plaintiff agrees with Defendants' recommendations.
2. Plaintiff adds:
    a. Do you or anyone in your immediate family work for Gestamp or have applied to work for Gestamp;
    b. Do you have a bias against lawsuits? Do you feel there are too many?
    c. Do you have a problem awarding monetary damages to a female who worked for Gestamp?
    d. Do you have a bias against women in workplace?
    e. Do you feel there are too many lawsuits?
    f. Have you ever filed a lawsuit?
    g. Do you have an issue with awarding damages in the form of monitory compensation if Plaintiff's proves annoyance, inconvenience, aggravation, mental distress, emotional damages, punitive damages, damages for lost wages, loss of enjoyment of life?

**Defendants:**

1.      Do you know, or are you related to, any attorney involved in this action?

2.      Have you or any of your family members been a client of any law firm involved in this action?

3.      Do you know any party in this action?

4.      Do you, or does someone close to you, have current or prior experience and/or training in any of the following:

a. Personnel/human resources

b. Employee benefits

c. Employee rules/manuals

d. Law  or Legal field/law-related field

e. Job laws

f. Affirmative action/ anti-discrimination  programs

5.      Have you, or has someone close to you, ever worked in the automotive manufacturing field or for a company that manufactures parts or components for automobiles?   If so, please describe.

6.      Have you, or someone close to you, ever file a charge with the EEOC?    If so, please describe.

7.      Have you, or someone close to you, ever filed a complaint, charge or claim with any federal or state court or agency? If so, please describe.

8.      Have you or any member of your immediate family ever had a complaint or claim filed by a federal or state court or agency against you? If so, please describe.

9.      Have you, or someone close to you, ever been involved in an employment dispute?      If so, please describe.

41

10.     How you ever been an employees at will?

11.     Have you ever managed or supervised people as part of your job?  If so, have you ever had to discipline or fire someone for any reason?

12.     Have you ever been a team lead in your job?

13.     Do you have any opinions, attitudes or beliefs, either positive or negative, about the defendant's field (automotive manufacturing) and/or the defendant?

14.     Have you, or has a family member or close friend, ever had a positive or negative experience with an automotive manufacturing company and/or the defendant? If so, please describe.

15.     Have you, or has anyone close to you, even felt discriminated against?  If so, please describe.

16.     Have you, or has anyone close to you, ever been discriminated against or harassed in any way, for any reason, by another individual or business? If so, please describe.

17.     Have you, or has anyone close to you, ever been accused of discrimination or harassment of any type? If so, please describe.

18.     Has your current employer ever been sued for discrimination or harassment? If so, please describe.

19.     If you own or ever have owned a business or been self-employed, were you ever sued for discrimination or harassment? If so, please describe.

20.     Have you, or anyone close to you, even taken leave from work due to medical reasons?  If so, please describe.

Case 2:20-cv-00146   Document 133   Filed 05/10/21   Page 43 of 46 PageID #: 4066

21.     Have you, or anyone close to you, ever taken leave under the Family Medical Leave Act? If so, please describe.

22.     Have you, or anyone close to you, ever made a request for accommodation under the Americans with Disabilities Act? If so, please describe.

23.     Have you, or has anyone close to you, ever been fired or laid off? If so, please describe.

24.     Have you, or anyone close to you, ever been turned down for a job you wanted or denied a promotion? If so, please describe.

25.     Have you ever worked in an environment where a co-worker's performance problems has affected or impacted your ability to perform your job? If so, please describe.

26.     Do you believe that an employee is guaranteed continued employment if he or she works at a facility for more than a year?

27.     Have you, or anyone close to you, ever have a romantic relationship with a co-worker while employed together? If so, please describe.

28.     Have you, or anyone close to you, ever had a romantic relationship with a supervisor while employed together? If so, please describe.

29.     Have you, or anyone close to you, ever had a romantic relationship with anyone who was a customer or client of your employer at the time you were an employee? If so, please describe.

**10.    A statement setting forth a reasonable estimate of the number of trial days required:**

The parties anticipate that trial will last between 3 and 5 days.

**11.    Any courtroom technology requested for use at trial and a certification that the court's technology staff has been notified regarding such use no later than 7 days before the scheduled commencement of trial:**

43

**Plaintiff:** Plaintiff request an HDMI component, speaker for playing recordings, and, if possible, a wireless component to stream data from a PC or Tablet for video productions of evidence. However, and HDMI "in" would be fine with plaintiff so long as it can stream content from PC or Tablet via USB-C, or Apple products (Mac Pro, iPad Pro).

**Defendants:** The Defendants anticipate using the Court's ELMO projector and perhaps integrating a computer presentation into the Court's audio-visual equipment. The Defendants will contact the Court's IT personnel in advance of trial, in order to facilitate this process.

12. **Any other matters relevant for pretrial discussion or disposition, including those set forth in Fed. R. Civ. P. Rule 16:**

Unknown at this time.
Plaintiff states resolution of the matter is possible and should be discussed.

<table>
<tr><td>

**AMBER D. HALL,**
**By Counsel.**

</td><td>

**GESTAMP WEST VIRGINIA, LLC;**
**KENNETH SUPRENANT; and**
**SCOTT HUGHES,**
**By Counsel.**

</td></tr>
<tr><td>

*/s/  D. Adrian Hoosier II     05/10/2021*
D. Adrian Hoosier II, Esquire (#10013)
**HOOSIER LAW FIRM PLLC**
Suite 100
213 Hale Street
Charleston, West Virginia  25301
(681) 265-5000
(681) 265-5001 (facsimile
adrian@hlfwv.com

**Counsel for Plaintiff**

</td><td>

*/s/  Raj A. Shah              05/10/2021*
Raj A. Shah, Esquire (#11269)
**HENDRICKSON & LONG, PLLC**
214 Capitol Street (zip 25301)
P.O. Box 11070
Charleston, West Virginia   25339
(304) 346-5500; (304) 346-5515 (facsimile)
rshah@handl.com

Ronald Flowers, Esquire
(*admitted pro hac vice*)
**BURR & FORMAN LLP**
420 North 20th Street / Suite 3400
Birmingham, Alabama 35203
(205) 251-3000; (205) 458-5100 (facsimile)
rflowers@burr.com

**Counsel for Defendants**

</td></tr>
</table>

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| | | |
|---|---|---|
| **AMBER D. HALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:  2:20-cv-00146** |
| | ) | |
| **GESTAMP WEST VIRGINIA, LLC,** | ) | |
| **BARRY HOLSTEIN, KENNETH** | ) | |
| **SUPRENANT & SCOTT HUGHES,** | ) | |
| | ) | |
| **Defendant.** | | |

## CERTIFICATE OF SERVICE

I, Raj A. Shah, do hereby certify that on the **10th day of May, 2021**, I have served a true and exact copy of the foregoing proposed **"FIRST AMENDED INTEGRATED PRETRIAL ORDER"** using the Court's CM/ECF system, which will electronically deliver a true copy thereof upon counsel of record listed below:

> D. Adrian Hoosier II, Esquire
> **HOOSIER LAW FIRM PLLC**
> Suite 100
> 213 Hale Street
> Charleston, West Virginia  25301
> *Counsel for Plaintiff*

> */s/  Raj A. Shah_____  05/10/2021*
> Raj A. Shah, Esquire (#11269)
> **HENDRICKSON & LONG, PLLC**
> 214 Capitol Street (zip 25301)
> P.O. Box 11070
> Charleston, West Virginia   25339
> (304) 346-5500
> (304) 346-5515 (facsimile)
> rshah@handl.com